(Reap. Dec. 9785)

BERBEN CORPORATION *v.* UNITED STATES

Entry No. 11564.

(Decided September 27, 1960)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Daniel I. Auster* and *Samuel D. Spector*, trial attorneys), for the defendant.

LAWRENCE, Judge: The Berben Corporation, plaintiff herein, challenges the appraisement of certain pistols manufactured by the firm of Pietro Beretta, located in Brescia, Italy, and imported at the port of New York.

The articles were appraised at a unit value per piece in lire upon the statutory basis of foreign value, which is set forth in section 402(c) of the Tariff Act of 1930 (19 U.S.C. § 1402(c)), as amended by the Customs Administrative Act of 1938.

Plaintiff contends that there is no freely offered foreign, export, or United States value, and that the proper basis of value is "cost of production."

The pertinent text of the statutes involved in this proceeding is here set forth—

Section 402 of the Tariff Act of 1930, as amended, *supra*:

*       *       *       *       *       *       *

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of

the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business ;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise ;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States ; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

Reference to the statutes will disclose that two of the vital requirements to prove foreign, export, or United States value are freedom from restrictions and a price to all purchasers. In the absence of foreign, export, or United States value, the next alternative is cost of production.

The evidence in behalf of plaintiff consists of the testimony of three witnesses together with the following documentary exhibits:

Collective exhibit 1—affidavit of Pier Carlo Beretta, managing director of the manufacturer and exporter of the pistols in controversy.

Collective exhibit 2—affidavit of Dr. Achille Bossi, an "Italian Counsellor at Law."

Exhibit 3—certificate of registration of "Beretta" trademark with the United States Patent Office.

The evidence introduced by the Government consists of the following documents and the official papers in the case:

Collective exhibit A—report of American consul general, Milan, Italy, dated October 2, 1952.

Collective exhibit B—report of the American consul general, Milan, Italy, dated June 23, 1953.

Collective exhibit D—report of Francis X. Di Lucia, Treasury representative in Charge, Milan, Italy, dated December 24, 1958.

Collective exhibit E—report of Francis X. Di Lucia, senior customs representative, Milan, Italy, dated March 11, 1959, together with an affidavit of Giuseppe Pier Beretta, managing director of the Pier Beretta firm, and supporting documents, in all, comprising 76 pages.

The only items in dispute are designated on the invoice as 418AM and 948LR, which are the same as 418 and 948, respectively.

The plaintiff's first witness, Harry Litwin, testified in substance as follows: Since 1951, he has been a member of the bar of the State of New York; that the Berben Corporation was organized by his office and he has been treasurer of the corporation since its organization. As treasurer, he had handled all of the correspondence with Beretta, the exporter, as well as the correspondence of its customer, J. L. Galef & Son, Inc., located in New York. All sales from Berben with the exception of three were to the Galef company. The Berben Corporation was the exclusive distributor in the United States of Beretta products. As a matter of fact, such merchandise was never sold or offered for sale by the Berben Corporation to all purchasers. The three exceptions, above mentioned, are the sale of 100 pistols to a party in Ontario, Canada, a sale for the Nationalist Army on Formosa of 100 pistols, and a sale amounting to nearly $30,000 to the Olin Industries, New Haven, Conn. The last-named sale was negotiated by Dr. Pier Beretta on behalf of Berben with the consent of the Galef company.

Transactions between Beretta and Berben, as well as those between Berben and Galef, were outright purchase and sale. Dr. Beretta was owner of 50 per centum of the stock in the Berben Corporation, the other 50 per centum being owned by the estate of Bennett G. Galef, Bennett G. Galef having been the owner until his death in an airplane accident in February 1959.

On cross-examination, the witness Litwin testified that Berben was not an agent but an outright purchaser and that he resold the pistols to Galef at a profit and not for a commission.

Plaintiff's second witness, Albert Baker, gave the following testimony:

He is vice president and sales manager for Galef & Son, Inc., in the Western States and the Southern States and has been sales manager for 12 years. He enumerated 19 States covered by his activities, the remaining States being handled by Sanford Hoagland, another sales manager for the Galef company.

He also stated that Galef does not resell Beretta pistols to all purchasers in the United States but only to selected jobbers, dealers, and mail-order houses, and that Galef suggests the resale prices which are usually adhered to. He stated that, in some areas, Galef does not sell

to all jobbers, dealers or mail-order houses. He described a jobber as one who sells to licensed dealers and not to retailers, while dealers sell at retail to licensed consumers, mail-order houses, and, likewise, to individuals, and that all of Galef's customers must have licenses required by law.

Baker testified to the manner in which the Galef company selected its dealers, jobbers, and mail-order houses, explaining that they were free to sell to anyone they desired but not at any price they wanted.

Baker was positive in his testimony that there was no pistol imported into the United States which is similar to the Beretta pistol, which has unique features. To illustrate this point, he stated that the barrels are entirely different from those imported by any other company.

Baker further stated:

* * * On the 6.35 model 418 Beretta the outward appearances has a hump on it, on the back part of the slide, with an extending firing pin which can be felt in the dark if the pistol was loaded. The barrel was exposed or is exposed on the Beretta pistol, whereas, on the others they are not, they are concealed. The barrel can be taken out of the Beretta pistol by a tap, tapping backwards and removing it, which would make it a five-second take down. The other particular pistols, you have to draw it back, hold the frame in place, and then twist and turn the barrel and have the entire frame coming forward with a possible chance of the firing pin and springs spreading out all over the landscape area, sir.

Later in his testimony, Baker explained that the Beretta pistol had two distinctive features not possessed by other imported pistols, namely, the "five second take down feature" and "interchangeable parts," which he regarded as very important to the ultimate purchaser.

On re-cross-examination, the witness stated that, in his opinion, there was no other imported pistol which is "equivalent" or "just as good as" the Beretta pistol.

The testimony of Sanford M. Hoagland, another vice president and sales manager for J. L. Galef & Son, Inc., for some 14 years, gave testimony substantially the same as the witness Baker.

Plaintiff's collective exhibit 1 contains the affidavit of Pier Carlo Beretta, who described himself as the managing director of a company known under the trade name of "Fabbrica d'Armi PIETRO BERETTA S.p.A," the manufacturer of the pistols in controversy. He had been discharging his duties as managing director for the past 8 years and "* * * had relations with the preceding Company for another period of twenty years." The nature of his duties was such that he had become intimately familiar with the articles sold by his company not only for use and consumption in the Italian domestic market but as well for export to the United States and other countries. He had personal knowledge of prices at which his company sells its merchandise and was familiar with the selling methods and

the terms and conditions under which his company sold its merchandise for consumption in Italy and for export to the United States.

He stated that Beretta does not sell its pistols indiscriminately to any buyer on the domestic market but only to some wholesale merchants and retail merchants.

This statement was followed by a list of wholesale merchants to whom Beretta made sales in 1952, 1953, and 1954, who were described as selected wholesale merchants, having the authority to effect sales in their district or territory.

In the territories not embraced in the foregoing, Beretta pistols were sold to retail merchants and not to wholesalers. The retail merchants, in turn, sold only to the consumers of the articles.

Beretta stated that the prices depend on the class to which the buyer belonged.

The Beretta company did not sell pistols for consumption in the Italian domestic market to any person who did not hold a permit or license issued by the Italian Government to buy firearms.

Upon the point of similarity, Beretta stated that other Italian companies do not make pistols similar to those of his company, explaining that Beretta's pistols are, among other things, patented and are very different from other pistols in style, design, workmanship, and selling prices.

With respect to sales for export, Beretta stated that all of his company's pistols were sold exclusively since 1952 to Berben Corporation and J. L. Galef & Son, Inc., both of New York.

Based upon his knowledge, experience, and observation, Beretta stated that Italian competitors do their business "* * * the same way we do * * *."

Finally, with respect to cost of production, Beretta set forth in tabulated form the cost of materials and manufacture, as well as the cost of handling and all other processes used in the production of each article in the period of 8 weeks prior to the date of exportation, which he stated was the time usually required to permit the manufacture and production of certain merchandise in the normal course of business.

The testimony of the witnesses Litwin, Baker, and Hoagland, together with the affidavit of Pier Carlo Beretta (collective exhibit 1), establishes to the satisfaction of the court that the pistols in controversy, identified as 418AM and 948LR, which are the same as 418 and 948, respectively, have neither a foreign nor export value, as defined in section 402(c) and (d) of the Tariff Act of 1930, as amended, *supra*, nor a United States value, as defined in section 402(e) of said act, as amended, and that statutory cost of production, as defined in section 402(f) of the Tariff Act of 1930, is the proper basis for appraisal.

The Government invites the court's attention to the following documents, which it contends substantiate the existence of a foreign value:

1. The consular invoice in column 11 sets forth a home consumption price.

2. Defendant's collective exhibit A, a report of Thomas D. Bowie, an American consul, in Milan, Italy, based upon an interview with A. Moederle, export manager of the manufacturer and exporter, who is reported to have stated that merchandise identical to that exported to the United States was freely offered for sale for home consumption in Italy to all classifications of purchasers; there were no restrictions of any sort imposed by the manufacturer on resale of the merchandise; the merchandise was freely offered for sale to all classifications of buyers; and that the only restrictions imposed are those exercised by the police power.

Attached to collective exhibit A, above quoted, is a pricelist which the Government contends established an export value "for all firearms, *except* pistols, and for a certain type of shotgun." [Italics supplied.]

Although the Government, in its brief, states that "The merchandise involved herein consisted of pistols and rifles exported from Italy * * *," it should be noted that plaintiff specifically limited its appeal to the items above specified.

The Government contends that inasmuch as the information contained in collective exhibits A and B was supplied by a representative of the manufacturer "prior to any knowledge of any dispute as to the value of the merchandise," the court should accord little credence to the statements in the affidavit, exhibit E, of Giuseppe Pier Beretta "mainly because he is financially interested in the importing firm, being a half owner thereof, and because it was tailored to meet the burden of proof which was thrust upon the importer at the subsequent trial."

This contention of the Government is somewhat extraordinary, in view of the fact that collective exhibit E was deliberately introduced in evidence as a part of the Government's case. If the report or a portion of it were distasteful, why was it placed in evidence?

In his letter, the Treasury representative states that, on March 9, 1959, he conferred with Beretta and Barboglio at the Beretta plant, at which time Beretta executed the affidavit attached to the Treasury representative's report. The Treasury representative quoted Beretta as saying "Actually, * * * there are only three categories to whom my firm sells fire arms in the home market and not four as previously stated. They are: wholesalers; retailers; and consumers."

In his affidavit, attached to the letter above referred to, Giuseppe Pier Beretta stated, among other things—

To the best of my knowledge, after studying the files of my firm relating to the period June 23 to December 23, 1953, I state the facts as set forth below : My firm does not sell its pistols, or any other kind of firearm, freely to all purchasers in home market, but only to certain wholesalers and retailers licensed under Italian laws to buy and sell firearms.

Deponent further stated—

* * * Before proceeding further I wish to state that a great deal of confusion has taken place in the past in that the true understanding of business methods in Italy has not been clarified. My firm, in order to create and give a sense of importance to our sales outlets have labelled as "wholesalers" retailers of firearms of a certain importance whose annual sales are over 1.500.000 lire.

Beretta then referred to the papers attached to his affidavit in which the pricelists are interpreted with reference to the various groups of purchasers for which they were intended.

There is nothing in the letter, dated March 11, 1959, by the senior customs representative, at Milan, Italy, which would indicate that he had any doubt as to the sincerity and honesty of Giuseppe Pier Beretta whom he interviewed. In any event, it is well established that a party to an action is bound by its own witnesses or its own documentary proof. *Snell Isle, Incorporated* v. *Commissioner of Internal Revenue*, 90 F. 2d 481.

Several judicial authorities have been cited by adversary counsel in their briefs upon well-settled principles applicable to valuation cases, which I find unnecessary to analyze here. The record evidence is full and complete in establishing the various material facts. If, as urged by the Government, it should appear on the surface that there is some disparity between so-called Treasury reports on the one hand, and sworn testimony on the other, the court is disposed to give greater credence and weight to sworn testimony submitted to the court with all the safeguards of a judicial trial. Furthermore, discrepancies between sworn testimony and reports of investigations may result from misunderstandings or other mistakes of meaning or intention.

The court is clearly of the opinion that the plaintiff has sustained its burden of proof and is entitled to judgement in its favor.

Based upon the record, the court makes the following findings of fact—

1. The merchandise involved in this case consists of Beretta pistols from Italy, identified on the invoice as items 418AM and 948LR.

2. Item 418AM is the same as 418; item 948LR is the same as 948.

3. The merchandise was appraised upon its statutory foreign value.

4. The pistols in question are patented and are not similar to other pistols imported into the United States.

5. At all times pertinent hereto, the exporter restricted its sales for home consumption to selected wholesale and retail dealers who

had Government licenses, and sold the pistols at different prices, depending upon the status of the purchaser.

6. The said wholesalers were restricted to making sales in their own districts.

7. The said wholesalers and retailers were likewise restricted to making sales to those holding Government licenses.

8. At or about the date of exportation, the manufacturer likewise restricted its sales for exportation to the United States to Berben Corporation and to J. L. Galef & Son, Inc.

9. The greatest volume of sales by the manufacturer during the period in question was made to the United States.

10. The profit ordinarily added by the manufacturers of merchandise of the same general character in Italy was not more than that added by the manufacturer of the pistols in question.

11. The cost of materials and labor, the usual general expenses, the cost of packing and containers, and the profit ordinarily added for the pistols in question are as follows, expressed in Italian lire:

| Item No. | Cost of materials and labor | General expenses | Packing and containers | Profit |
|---|---|---|---|---|
| 418AM | 2, 810 | 1, 680 | 60 | 675 |
| 948LR | 3, 990 | 2, 400 | 60 | 960 |

12. The respective costs of production of the pistols in question are as follows:

| Item No. | Cost of production |
|---|---|
| 418AM | 5, 225 Italian lire per pistol |
| 948LR | 7, 410 Italian lire per pistol |

The court concludes as matters of law—

1. That such or similar merchandise was not freely offered for sale to all purchasers in the principal markets of Italy for home consumption or for exportation to the United States, within the contemplation of section 402 (c) and (d) of the Tariff Act of 1930, as amended, *supra*;

2. That such or similar merchandise was not freely offered for sale to all purchasers in the principal markets of the United States, within the provisions for United States value in section 402(e) of said act;

3. That cost of production, as defined in section 402 (f) of the Tariff Act of 1930, is the proper basis for determining the values of the pistols in question; and

4. That such cost of production is as follows:

| Item No. | Cost of production |
|---|---|
| 418 AM | 5, 225 Italian lire per pistol |
| 948 LR | 7, 410 Italian lire per pistol |

Judgment will be entered accordingly.