(A. R. D. 71)

United States v. Dan Brechner, Jacob Brechner, Joseph Brechner, Herbert Brechner, a co-partnership doing business under the name and style of Dan Brechner & Co.

Entry No. W–5459–2, etc.

Second Division, Appellate Term

(Decided April 24, 1957)

*George Cochran Doub*, Assistant Attorney General (*Samuel D. Spector* and *Daniel I. Auster*, trial attorneys), for the appellant.
*Jordan & Klingaman* (*Jacob L. Klingaman* of counsel) for the appellees.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: This is an application for review of a decision and judgment of a single judge sitting in reappraisement, dated June 22, 1956 (36 Cust. Ct. 612, Reap. Dec. 8599). Eight appeals for reappraisement, consolidated for the purposes of trial, are here involved. They relate to a variety of articles shipped from Yokohama, Japan, during the months of June, July, and August 1950.

The parties agree, and the trial judge so held, that export value, as defined in section 402 (d) of the Tariff Act of 1930, is the proper basis of value for the merchandise covered by these appeals. They are at issue over the question of whether certain so-called export charges, listed as inland freight, storage, hauling and lighterage, insurance premiums, petties, and commissions, any or all of them, as invoiced, are part of that value.

It appears that these items, when and as they are shown on the invoices, except for the item of commission, were added to the total so-called first cost or ex-factory prices specified on the invoices, to make entered value, because of advances by the appraiser in similar cases then pending, and that duress certificates were filed in compliance with the provisions of section 503 (b) of the Tariff Act of 1930, which reads as follows:

(b) ENTRIES PENDING REAPPRAISEMENT.—If the importer certifies at the time of entry that he has entered the merchandise at a value higher than the value as defined in this Act because of advances by the appraiser in similar cases then pending on appeal for reappraisement or re-reappraisement, and if the importer's contention in such pending cases shall subsequently be sustained, wholly or in part, by a final decision on reappraisement or re-reappraisement, and if it shall

appear that such action of the importer on entry was taken in good faith, the collector shall liquidate the entry in accordance with the final appraisement. [In force and effect at the time of these importations but subsequently repealed.]

As is evidenced by the check mark appearing in the column headed "APPRAISED" on the "SUMMARY OF ENTERED VALUES," customs Form 6417, and the explanation thereof, all of the involved merchandise was appraised, as entered, under duress. Although, in connection with certain of the entries, the examiner made the notation that—

The amounts of the FOB charges duressed appear excessive and should not exceed three percent of the FOB seaport prices—

no adjustment to reflect said statement in the appraised values was made.

In the course of certain pretrial hearings and at the trial itself, counsel for the respective parties limited the issues in the case to the site of the principal market or markets and, subject to attack by appellant on the ground of excessiveness, the question of whether the various additions either made by the appraiser, or by the importer under duress, were properly a part of the value of the merchandise.

The only witness in the case was Jacob Brechner, one of the plaintiffs, who testified that, in making purchases in Japan, it was the usual practice of his firm to call upon the various manufacturers of the articles they desired to buy, in the company of their Japanese agent, or to have the manufacturers call at the agent's place of business. With the agent acting as interpreter, negotiations were conducted toward a satisfactory price agreement between the manufacturers and appellees. This price, quoted in yen, was the manufacturer's ex-factory price and included only the manufacturer's profit. The agent would convert the yen quotation into United States currency, add thereto what he considered the shipping charges and his commission of 5 per centum, and then give Brechner & Co. "what is called an f. o. b. price." In addition, the agent checked the quality of the merchandise, consolidated shipments from various manufacturers, prepared consolidated invoices, and arranged for the exportation of the merchandise.

The consolidated invoices, of which that in reappraisement 200311-A, in evidence as defendant's collective exhibit A, is fairly typical, appear to corroborate this portion of the witness' testimony. This exhibit shows five orders from five different Japanese manufacturers, the dates of acceptance of said orders, the first cost or ex-factory price per gross, in United States dollars, and the total first cost or ex-factory price, including case and packing charges. Added to said total are the following items, listed as "EXPORT CHARGES": Inland freight from Tokyo to Yokohama; storage; hauling and lighterage; a commission on the total first cost or ex-factory price; and the consular fee.

We deem it appropriate here to observe that, if the manufacturers' prices were f. o. b. port of shipment prices, as here claimed by appellant, export charges for each manufacturer's wares should be expected to be separately invoiced so as to reveal a separate f. o. b. price for each quotation. The lump-sum statement of charges for freight, et cetera, for orders placed with different manufacturers tends to support the witness' testimony to the effect that the manufacturers' quotations were ex-factory, and there is no evidence of record to show otherwise.

Brechner further stated that, after the authority of the Supreme Command Allied Powers, known as SCAP, and of the Japanese Board of Trade, called Boeki-Cho, over exportations from Japan expired on December 1, 1949, letters of credit were issued directly to his company's agents, who, in turn, paid the manufacturers. He testified that the places where the factories were located in the environs of Tokyo were the places where this type of merchandise could be purchased and that "Tokyo was the principal place, mainly in the outskirts of Tokyo."

In connection with the methods of arriving at agreed prices for merchandise purchased in Japan, the witness testified as follows, in response to questioning by the court:

BY JUDGE MOLLISON

\* \* \* \* \* \* \*

Q. I am getting at this: If you got a price from one manufacturer and there were 3 or 4 other manufacturers manufacturing the same article did you have to know anything about what that first manufacturer's competitors were charging?— A. Well, we would see all the manufacturers. We would say, let's say somebody made, we will just refer to this alligator. We would see several people who made rubber articles, and either ask them to have the specific item or what it would cost to make this same item. In that way we would arrive at what we would consider competitive price.

Q. Were you then familiar with the market prices of other manufacturers who sold competitive articles to those that you purchased?—A. Yes, we were familiar with it.

Q. And how did you acquire that familiarity?—A. By being in the market, checking with various manufacturers.

Q. What do you mean by checking?—A. Well, going, let's say for example, one item might have been made by 4 or 5 people, or they made similar items, we would have a sample, and we would go to this one manufacturer, get his price from the original manufacturer, and then we would go to see others who were making similar, or could make the same item, and inquire from them what their price would be for this article.

Q. Well, now, did this, we will say selling practice or procedure, in the purchase of this merchandise in the various Japanese markets, was this a general practice or did it vary from, we will say, an American purchaser to American purchaser; in other words, was this competent or usual practice, the one that you adopted in these cases?—A. That was the usual—usual common practice, your

Honor. It is the same practice that we adopted from the inception of our purchases in Japan.

Q. Well, I am not talking so much about what you did, but I am talking about what your practice was, that one that was generally adopted and had by other American buyers in those Japanese markets.—A. Yes, I would say so, because they would all do the same thing as we did, call at various manufacturers.

Q. Did your buying agent represent any other American buyer?—A. Some of them do; some of them don't. In the main just this specific one, Matsuzaki & Co., only had us as their American customer.

Q. But was it—do you know of any situations where the buying agent represented a number of American, different American firms?—A. Yes, your Honor.

Q. Is that a common situation?—A. Yes, that is even today a common situation.

  \*   \*   \*   \*   \*   \*   \*

At a subsequent hearing, upon an order setting aside the submission, witness Brechner, recalled, testified that generally the practices of buying adopted by his firm were the same for other importers in the United States and that it was customary for "importers of our standing" to employ and have similar relationships with Japanese agents.

In its opinion, the trial court held that it could properly consider the question of whether or not the commissions paid to the Japanese agents were or were not a part of the value of the merchandise covered by these reappraisements, even though said items were originally included as dutiable and not added back to make entered value, for the reason that the issue before the court in entries, filed pursuant to the provisions of section 503 (b), *supra*, is the value of the merchandise in said duressed entries and not the value of the merchandise in the so-called test cases. Citing House Joint Resolution No. 336, 72d Congress, First Session (47 Stat. 657), 28 U. S. C., section 2631, and the case of *United States* v. *Innis Speiden & Co. et al.*, 23 C. C. P. A. (Customs) 4, T. D. 47653.

It further held, under authority of *United States* v. *Fritzsche Bros., Inc.*, 35 C. C. P. A. (Customs) 60, C. A. D. 371, and *United States* v. *Freedman & Slater, Inc.*, 25 C. C. P. A. (Customs) 112, T. D. 49241, that an appealing party in a reappraisement proceeding may challenge any one or more of the items entering into an appraisement, while relying upon the presumption of correctness of the appraiser's return in respect of all other items, whenever the challenged items do not bring into question the balance of the appraisement. The court construed the instant case as one in which this principle applies, upon the theory that the appraisement was "in effect an appraisement at invoiced 'first cost' or *per se* prices, plus packing, plus the disputed additions for commission and export charges." Accordingly, the court was of opinion that other elements entering into the determination of export value, with respect to said *per se* prices, such as the

freely offered price, the principal market, the usual wholesale quantities, and the ordinary course of trade, were not in issue.

In addition, the court found that the commissions paid to the Japanese agents were *bona fide* buying commissions, not a part of the value of the merchandise; that the so-called export charges were not included in the freely offered price to all purchasers; and, with respect to the allegation of defendant below that said charges were excessive, that the appraiser having incorporated the same as added in his return of value, they must be deemed to be correct.

Accordingly, the trial court found export value to be "the entered and appraised values, less the invoiced amounts for inland freight, storage, hauling and lighterage, insurance premiums, petties, and commissions, only in the cases where those items, or any of them, appear on the invoices."

Before this court, counsel for appellant makes the following contentions:

1. There was no competent proof of the principal markets in Japan for each and every item.

2. There was no competent proof as to the price at which such or similar merchandise was sold or freely offered for sale in the principal markets in Japan for export to the United States.

3. There was no proof of the correctness of the amounts entered under duress, such as shipping charges, cartage, etc.

4. The so-called buying commissionaires were the actual sellers in five of the eight appeals.

5. The Court erred in denying the Government's motion to incorporate the record in the case of *S. Stern Henry & Co.* v. *United States*, Reappraisement No. 170134-A (R. D. 8168), 29 Cust. Ct. 479, reversed in 33 Cust. Ct. 592, A. R. D. 51.

Concerning contention No. 5, it need only be said that no specific assignment of error having been addressed to this action on the part of the trial court, the matter is not properly before us for consideration. *J. M. Da Roche* v. *United States*, 26 C. C. P. A. (Customs) 78, T. D. 49613.

Appellant's essential dispute with the decision of the trial court lies in the underlying proposition that the unit values returned by the appraiser were not separable into first cost and additional charges, but were, in fact, total unit values, not subject to partial attack under the principle of the *Fritzsche* and *Freedman & Slater* cases, *supra*. It is for this reason that appellant urges the necessity of proof, but the lack thereof, of the principal markets in Japan, and the freely offered price to all purchasers.

Especially in view of the method of invoicing the merchandise involved in these cases—the specification of first cost or ex-factory

prices, and the addition of total export charges—and appellant's concessions, made on several occasions during both the pretrial hearings and the trial itself, that the only issues in these cases were the principal market and the export charges, the latter being subject to the objection of excessiveness, we deem appellant's position to be untenable.

It seems clear that the *per se* unit values were never in dispute. As invoiced, they were adopted by the importer; as invoiced, they were accepted and approved by the appraiser in his return. It is not to be supposed, because the appraiser also included the export charges in the value which he found, that the *per se* invoice prices were not a separate element.

We are in agreement with the trial court that the rule of the *Fritzsche* and *Freedman & Slater* cases, *supra*, as approved in *United States* v. *Schroeder & Tremayne, Inc., et al.*, 41 C. C. P. A. (Customs) 243, C. A. D. 558, applies, and that appellees had the right to rely upon the presumption of correctness of the appraiser's return, with all of the findings inherent therein, with respect to all items not specifically challenged in this action.

Moreover, we are of opinion that the evidence establishes that Tokyo, or its environs, was the principal market for the sale of all of the merchandise covered by these appraisements and that other American importers purchased their wares in the same manner as did appellees. The testimony of plaintiffs' witness, which is not controverted, clearly depicts an open market in which all American importers were free to purchase at competitive prices. In view of the fact that it was the practice of American importers of the standing of appellees to employ agents who performed the same services for them as did appellees' agents for appellees, it is reasonable to assume that they, too, were able to make their purchases as appellees did, to wit, upon an ex-factory basis.

In the case of *United States* v. *Paul A. Straub & Co., Inc.*, 41 C. C. P. A. (Customs) 209, C. A. D. 553, our appellate court was concerned with the question of whether inland freight from the principal market to the port of exportation formed a part of the export value of certain decorated china ornaments exported from Germany. In holding that it did, the court emphasized the fact that all sales and offers for sale of such or similar merchandise were made at f. o. b. port of exportation prices, and no sales or offers for sale were ever made on an ex-factory basis at prices which did not include inland freight.

It seems clear from the following statement in the *Straub* case, *supra*, that, if such or similar merchandise had been offered for sale

in the principal market, and/or ex-factory, at prices which did not include the freight charges, a different result would have been reached:

The appellant willingly concedes that if the merchandise in the instant case could have been purchased in the principal market of Selb-Stadt for an amount less than that at which it could have been procured at Bremen, the port of exportation, the inland freight charges would not have been dutiable.

For the purposes of the instant case, we need only consider the alternative situation thus posed. Was the merchandise at bar offered for sale on an ex-factory basis at prices which did not include these additional charges? Except for the period of control exercised by SCAP and Boeki-Cho, which control terminated before any of the exportations at bar occurred, appellees most assuredly were able to buy their merchandise in that manner. It was the usual, common practice for them to do so. Since ex-factory sales, exclusive of export charges have been shown, those charges form no part of the value of the instant merchandise, and the trial court properly so held.

Neither do we regard as inconsistent the trial court's consideration of, and exclusion from the value which it found, the commissions paid to the agents. Notwithstanding the fact that said commissions were originally included in the entered value, and not added back, under duress, they were never incorporated in the *per se* prices, as invoiced. They were items separately specified as 5 per centum of the total first cost or ex-factory prices. If, as we have held, the appraisements constituted, in the first instance, approval of the ex-factory prices, any added charges, whether or not duressed, may appropriately form the subject of judicial scrutiny for the purposes of determining the value of the merchandise, which, in the final analysis, is the court's function in all reappraisement actions. (28 U. S. C. § 2631.) The same principles which support a consideration of the other export charges make it necessary and proper to ascertain whether the items listed as commissions were part of the value of the merchandise before us.

We are of opinion that the evidence conclusively establishes that, in their transactions with appellees, the commissionaires acted as agents and not as sellers. The part they took in the negotiations leading up to the purchase of these various articles and their exportation from Japan was that of representatives of the buyers, rather than that of middlemen. Agreement upon essential terms was reached between the Japanese manufacturers and the American purchasers, the commissionaires having no authority with respect thereto. The services which they performed, as outlined by the witness, and substantiated by the president of Matsuzaki & Co., Ltd., in his affidavit of July 3, 1950, in evidence as defendant's exhibit D, were typical of

those ordinarily rendered by *bona fide* buying agents. The law is well settled that commissions charged by such agents do not form part of the value of imported merchandise. *Stein* v. *United States*, 1 Ct. Cust. Appls. 36, T. D. 31007; *United States* v. *Bauer et al.*, 3 Ct. Cust. Appls. 343, T. D. 32627; *United States* v. *Case & Co., Inc.*, 13 Ct. Cust. Appls. 122, T. D. 40958.

We are in agreement with the trial court that the claim of appellant with respect to excessiveness of the export charges is without merit. Appellees were entitled to rely upon the presumption of correctness attaching to the appraiser's return of value to support the accuracy of those charges, and the burden of establishing that they were incorrect, not here sustained, rested with appellant. The appraiser would not have been justified in including exorbitant charges in his return of value merely because he was put on notice by the importers' additions on entry and the filing of duress certificates that such charges would be claimed to be nondutiable.

Accordingly, we find:

1. That the merchandise at bar consists of a variety of articles exported from Japan during the months of June, July, and August 1950.

2. That at or about the dates of exportation of said merchandise there were no sales or offers for sale thereof for home consumption in Japan.

3. That Tokyo and its environs were the principal markets in Japan in which such or similar merchandise was offered for sale for exportation to the United States.

4. That the evidence establishes that such or similar merchandise was freely offered for sale for exportation to the United States to all purchasers in said principal market at the *per se* unit values listed on the invoices covered by the instant appeals as first cost or ex-factory prices, packing included.

5. That the importers employed commissionaires resident in Japan as purchasing agents, to whom a commission in the amount of 5 per centum of said ex-factory prices was paid.

We conclude, therefore:

1. That export value, as defined in section 402 (d) of the Tariff Act of 1930, is the proper basis of value for the merchandise herein and

2. That such values in each case are the entered or appraised values, less the invoiced amounts, as and if they appear thereon, for inland freight, storage, hauling and lighterage, insurance premiums, petties, and commissions.

The judgment of the trial court is, therefore, in all respects affirmed. Judgment will be entered accordingly.