(A.R.D. 145)

UNITED STATES *v.* SUPREME MERCHANDISE COMPANY

Entry No. WH 00095, etc.

## Second Division, Appellate Term

(Decided June 14, 1962)

*Joseph D. Guilfoyle*, Acting Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellant.

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt* and *Howard Clare Carter* of counsel) for the appellee.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: This is an application for a review of a decision and judgment (Reap. Dec. 10025) sustaining the values claimed by plaintiff below as the proper values of certain cigarette lighters, imported from Japan. The case embraces 17 appeals for reappraisement, which were consolidated for purposes of trial. In all, except reappraisements R58/22216, R58/22219, and R58/22222, the appraised values were expressed in terms of invoiced unit values, net, packed, plus items invoiced as shipping charges and commission. In the excepted reappraisements, *supra*, the appraised values were, in effect, f.o.b. port of exportation prices.

Appellee contends, and the trial court held, that the *per se* ex-factory unit prices, as invoiced, properly represent the values of the subject lighters.

Both parties rely upon export value, as that value is defined in section 402(d) of the Tariff Act of 1930, and it is virtually agreed that such or similar merchandise was not offered for sale or sold for domestic consumption in Japan. The statutory definition of export value reads as follows:

The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

For reasons which will appear, *infra*, and under well-settled principles of law, it is clear that the determination of whether the claimed values or the assessed values should be held to constitute statutory export value depends, in the final analysis, upon the status of the foreign shipper of the involved merchandise. If, as contended by counsel for appellee, the shipper was a *bona fide* purchasing agent for the importer, and the merchandise was freely offered to all purchasers at ex-factory prices, exclusive of shipping charges and commission, then the claimed values were properly sustained by the trial court. If, however, the shipper was, in fact, a seller, or, alternatively, an agent for the seller, and the record does not show that such or similar merchandise was freely offered for sale to all purchasers for exportation to the United States, in the usual wholesale quantities and in the ordinary course of trade, at ex-factory prices, then the appraised values should have been affirmed.

The framework of legal principles within which the disposition of this case must be confined has been developed in a series of cases generally involving the issue of whether or not inland freight and other shipping charges form part of the export value of imported merchandise. An extensive review of this proposition in the cases of *United States* v. *Paul A. Straub & Co.*, 41 C.C.P.A. (Customs) 209, C.A.D. 553, and *Albert Mottola, etc.* v. *United States*, 46 C.C.P.A. (Customs) 17, C.A.D. 689, led to the conclusion that where merchandise is offered for sale and sold on an f.o.b. port of exportation basis, and is never sold or offered for sale at ex-factory prices, the inland charges incurred in transporting merchandise from the factory to the f.o.b. point form an integral part of the value of such merchandise. Where, however, ex-factory sales are shown, and it is established that such or similar merchandise is freely offered for sale to all purchasers, in the usual wholesale quantities and in the ordinary course of trade, at ex-factory prices, freight and other charges subsequently accruing are not elements entering into the determination of export value. *United States* v. *Gitkin Co.*, 46 Cust. Ct. 788, A.R.D. 132.

Moreover, the extent to which ex-factory sales need be proven depends upon the method employed to invoice the goods, and the way in which the appraiser makes his return of value. If ex-factory prices

and other charges are separately stated on the invoices and the appraiser's finding of value is expressed in terms of the invoice unit prices, plus the questioned charges, the appraisement is deemed to be separable. *United States* v. *Dan Brechner et al.*, 38 Cust. Ct. 719, A.R.D. 71; *United States* v. *Gitkin Co., supra*; *Valley Knitting Co., Inc., et al.* v. *United States*, 44 Cust. Ct. 599, Reap. Dec. 9627. Under the rule expressed in *United States* v. *Fritzsche Bros., Inc.*, 35 C.C.P.A. (Customs) 60, C.A.D. 371, a party to a reappraisement proceeding may challenge one or more of the elements entering into an appraisement, while relying upon the presumption of correctness of the appraiser's return as to all other elements, whenever the challenged items do not disturb the effect of the remainder of the appraisement. Such is the case in the instance of an appraisement at ex-factory-plus-charges value, and the charges may be disputed without the necessity of proof that the ex-factory prices comply with the statutory definition of export value. *United States* v. *Dan Brechner et al., supra.*

It is further well established, as stated by the trial court "that a charge for services associated with the purchase of merchandise in the foreign market, and which is not an amount that inures to the benefit of the seller, is a buying commission, which, although affecting the cost of goods to the importer, is not part of the market value of the merchandise. *United States* v. *Case & Co., Inc.*, 13 Ct. Cust. Appls. 122, T.D. 40958; *United States* v. *Alfred Kohlberg, Inc.*, 27 C.C.P.A. (Customs) 223, C.A.D. 88; *Stein* v. *United States*, 1 Ct. Cust. Appls. 36, T.D. 31007." However, the *bona fides* of a buying commission is a question of fact to be determined from the evidence adduced in any particular case. *United States* v. *Nelson Bead Co.*, 42 C.C.P.A. (Customs) 175, C.A.D. 590.

Since, with respect to 14 of the 17 cases here involved, the appraisements were what we have termed separable, and subject to challenge with reference to the items of commission and shipping charges, the question arises whether the evidence suffices to show that the exporter of the merchandise at bar was a *bona fide* representative of the purchaser whose services included buying at ex-factory prices, and payment of charges for transporting the goods from the factory to the ship.

The circumstances surrounding the purchase of the instant merchandise and the relationship between exporter and importer were the subject of the testimony of Martin Cannon, a partner of the firm of Supreme Merchandise Company (hereinafter sometimes called Supreme), appellee herein. The evidence which he gave on direct examination tended to show the following: As buyer for his company, which was engaged in the business of importing smokers' articles during the period between 1955 and 1958, he made a trip to Japan in May

1955. There, he contacted "a few suppliers," one of whom he identified as Ichikawa. Ichikawa put him in touch with a manufacturer by the name of Toho, who quoted prices in yens. Ichikawa added his expenses and a 7½ per centum commission and figured a total c.i.f. price in United States dollars.

On his second trip to Japan, Cannon conducted his business through a Mr. Aoyagi, who was accompanied by his manager and interpreter, Mr. Akiyama. After being shown samples of the Japanese lighters Cannon desired to buy, they introduced two manufacturers to him, one called Aoki, the other Daiwa, who, like Toho quoted ex-factory yen prices. Like the negotiations with Ichikawa, Aoyagi then added his buying commission and other charges and figured the c.i.f. prices in American dollars.

Arrangements were made for Aoyagi to perform the following services:

* * * He picked up the merchandise at the factory to his place. He did inspect the merchandise; it is the usual thing what he is doing, packed for export, prepared the invoices, made arrangements for exportation, paid shipping charges and others for Supreme. He did the correspondence, and he paid the manufacturer the ex-factory price on account of my letter of credit which I established for Aoyagi and not for the manufacturer, and the balance, amounting to 7½ per cent of the ex-factory price he kept for his services.

Purchases were never made directly from Aoyagi, but letters of credit were opened in the names of Ichikawa and Aoyagi. To substantiate his testimony that Aoyagi was, in fact, a buying agent, Cannon submitted a statement of Aoyagi Metal Mfg. Co., Ltd. (herein sometimes called Aoyagi) by its manager Akiyama, verified before the United States consul October 24, 1956 (plaintiff's exhibit 1), wherein the company certified that it purchased lighters from manufacturers as agent of Supreme Merchandise Company, receiving a 7½ per centum commission, and that it did no manufacturing or assembling on its own account.

The relationship between Cannon and Aoyagi became strained sometime during 1957, when the latter spread rumors that his company was being bankrupted because of the actions of Supreme Merchandise Company. Cannon disclaimed his company's responsibility for Aoyagi's failure, explaining that although he extended the letter of credit to Aoyagi in 1956, due to delivery delays, he refused to do so in 1957, because deliveries were less than agreed upon and because prices of lighters went down in 1957.

Appellee also offered in evidence, as plaintiff's collective exhibits 2 and 3, affidavits of Yakichi Oaki, director of Aoki Seisakujo, and Masatoshi Haneda, president of Daiwa Seisakujo, respectively. In similar phraseology, each recites that his company sold certain items of cigarette lighters at stated ex-factory prices to Mr. Martin Cannon

of Supreme Merchandise Company; that his company offered identical merchandise to anyone who cared to purchase it for exportation to the United States at the same prices, without any restriction, except that it would not sell in quantities of less than 100 dozen; and that Tokyo was the principal market for the sale of cigarette lighters. Each affiant affirmed that he understood that Aoyagi was the agent for Supreme and that the purchaser or his agent was responsible for all charges arising after the merchandise left his factory. Attached to each affidavit is a list of sales purporting to show that cigarette lighters were freely offered to all purchasers. Both lists are preceded by Japanese characters, not translated, and appear to be duplications of the sales listed in the main body of the affidavits as merchandise sold to Supreme.

The cross-examination of appellee's witness was extensive. Through the introduction of documents taken from appellee's office files, consisting of papers labeled "pro-forma" invoice, advance invoice, confirmations of order, and of correspondence between the shipper and the importer, defendant's exhibits and collective exhibits B through J, inclusive; and a report of the supervising Treasury attaché in Tokyo, Japan, dated April 5, 1957, defendant's collective exhibit K, appellant sought to establish that the relationship between Supreme Merchandise Company and Aoyagi Metal Mfg. Co., Ltd., was that of buyer and seller, rather than that of principal and agent.

The trial court found defendant's exhibits to be "not entirely clear" and tending "to reflect a confusing, if not contradictory, situation" and held that—

* * * the witness' testimony, on redirect examination and under questioning by the court, satisfactorily clarified the contents thereof to say that plaintiff's purchases of these cigarette lighters in the foreign market were always made, during the period under consideration, through a buying agent who received a commission for his services, and the services performed by the buying agent were the usual services of such agents in Japan in purchasing, inspecting, and shipping merchandise.

With respect to the report of the Treasury attaché, the court evaluated it as tending to support plaintiff's position, especially for the reason that it "states that Aoyagi 'might be considered a buying agent since he does not place firm orders with makers until he, in turn, receives firm orders from importers.' "

Although finding the record not free of conflicting statements, the trial court held that the weight of the evidence preponderated in favor of appellee.

We have carefully considered the written evidence in the light of the explanations given by the witness, and the weight attached to both by the trial court. While certain inconsistencies exist between the correspondence and the verified portions of the record, as, for

example, references in the latter to orders from the shipper, agreements to purchase, price quotations, and instructions as to quality and engineering of the products, we agree that the weight of the sworn testimony and supporting verified statements preponderates. Positive sworn testimony is ordinarily entitled to greater weight than univerified statements. *W. Stuart Smith* v. *United States*, 23 Cust. Ct. 20, C.D. 1182.

It is clear that the correspondence was not drafted with any precise attention to the legal relationship between the parties. It appears merely to have been couched in phraseology convenient to the expeditious shipment of merchandise purchased by Supreme. There is no basic irreconcilable conflict between Cannon's statements concerning his negotiations with Aoyagi and the manufacturers, and the letters exchanged between Aoyagi and Supreme.

We are of opinion that Cannon's explanation of Aoyagi's bankruptcy further tends to corroborate his testimony. He explained that Aoyagi's bankruptcy was caused by his (Aoyagi's) having to pay all charges involved in accumulating as many as 20,000 dozen lighters, stating—

No, he didn't buy them, he just accumulated the lighters for us ; then somebody came, another importer, and bought the lighters from Aoki; and Aoki and Daiwa sold my lighters through Aoyagi. And then something happened between him and Aoki, and Daiwa, and he couldn't—I don't know how he didn't manage to pay all the shipping charges—shipping charges and holding, and all kinds of—it's a lot involved in it.

Accordingly, we sustain the finding of the trial court that Aoyagi was a *bona fide* buying agent whose commissions form no part of the export value of the merchandise covered by these appeals for reappraisement.

Under the circumstances that the instant record establishes ex-factory sales, and that the appraisement of 14 of the within appeals rests in the first instance upon ex-factory unit prices, we deem the affidavits of the manufacturers (plaintiff's collective exhibits 2 and 3) to be sufficient, for the purposes of this case, to establish ex-factory prices in those appeals in which appraisements were at the equivalent of f.o.b. port of exportation prices.

Based upon the foregoing considerations, we find that—

1. The merchandise covered by the instant appeals for reappraisement, consolidated for purposes of trial, consists of cigarette lighters, exported from Japan during 1956 and 1957.

2. Said merchandise was entered at the invoiced unit ex-factory prices, exclusive of shipping charges and agent's commission.

3. Said merchandise was appraised at the invoiced unit values, net, packed, plus items invoiced as shipping charges and commission, or at, in effect, f.o.b. port of exportation prices.

4. Said merchandise was not exported by the manufacturers thereof, but by a shipper who negotiated on behalf of importer for the purchase thereof.

5. The exporter acted as buying agent for the importer in connection with the purchase and shipment of the instant merchandise.

6. Said merchandise was freely offered for sale to all purchasers at ex-factory prices, which did not include inland charges or buying commission.

The court, therefore, concludes that—

1. Export value, as that value is defined in section 402(d) of the Tariff Act of 1930, is the proper basis of value for the determination of the value of the merchandise covered by the instant appeals for reappraisement.

2. Such values are, in each case, the entered values.

3. The decision and judgment of the trial court are affirmed.

Judgment will be entered accordingly.