(R.D. 11720)

KARL SCHROFF & ASSOCIATES, INC., ET AL. v. UNITED STATES

Entry Nos. 24748, etc.

(Decided August 20, 1970)

*Schwartz & Lidstrom* (*Earl R. Lidstrom* and *Barnes, Richardson and Colburn* of counsel) for the plaintiffs.

*William D. Ruckelshaus*, Assistant Attorney General (*Glenn E. Harris, Steven R. Sosnov* and *Urban S. Mulvehill*, trial attorneys), for the defendant.

MALETZ, Judge: These three consolidated appeals for reappraisements involve the propriety of including certain inland charges in the dutiable value of various motors and parts for roadway racing sets that were imported from Japan in 1965.[1] In two of these appeals, the several items of merchandise were entered at invoice unit prices but advanced by the government appraiser. Thus in R66/21838, merchandise manufactured by four Japanese companies was appraised at the invoice unit prices plus the (proportionate) cost of charges marked

---

[1] The facts are set out in the opinion. The articles in question are not on the Final List.

"X" by the appraiser—which charges consisted of inland freight to shipping port, insurance premium from godown to on board, storage, hauling and lighterage, and petties.[2]

Similarly in R66/21841, merchandise manufactured by two companies (and marked with the letter "B" by the appraiser) was appraised at the invoice unit prices plus the cost of charges he marked "X" (which charges likewise consisted of inland freight to shipping port, insurance premium from godown to on board, storage, hauling and lighterage, and petties).[3]

A different situation is presented in R66/19895 which involves merchandise exported from Japan on August 4, 1965. The merchandise consisted of two types of motors manufactured by a single company. Three invoices were filed with the entry: the first dated August 2, 1965, covers 28 cartons of motor No. 40531 and 1 carton of motor No. 40536; the second dated August 3, 1965, covers 2 cartons of motor No. 40536; and the third dated August 4, 1965 (the date of exportation), covers all 31 cartons. On the invoice dated August 3, there is a notation by the appraiser that the merchandise was "appraised at invoiced unit values above, net, packed" with the values so referred to being f.o.b. Tokyo prices. However, there is no statement of appraisement on the August 2 invoice which covers the remaining 29 cartons of merchandise. Nor is there a statement of appraisement on the August 4 invoice. From this it must be concluded that the 29 cartons of motors covered by the August 2 and August 4 invoices have not been appraised.

The dispute is thus narrowed to R66/21838 and R66/21841 and centers on the question of whether export value—which both sides contend is the proper basis of appraisement [4]—is represented by the invoice unit prices as plaintiffs claim, or is represented by the invoice unit values plus the inland charges marked "X" added by the appraiser, as defendant maintains.

[2] Merchandise involved in R66/21838, which was manufactured by three other manufacturers, was appraised at the invoice unit values, net packed, and no claim is made for any lower values. It may be noted that neither in R66/21838 nor in R66/21841 was a Japanese agency buying commission of 5 percent marked "X" by the appraiser.

[3] Merchandise involved in R66/21841 that was manufactured by two other companies was marked by the appraiser with the letter "A", which, according to his notations on the invoice, signified that such merchandise was "appraised at the invoice unit value, net packed." However, the letter "A" and the corresponding statement of appraisement was then stricken out by the appraiser. In these circumstances, all the merchandise covered by the invoice in R66/21841 is treated as though it was appraised on the basis of the "B" statement of appraisement, i.e., on the basis of the unit prices plus the inland charges marked "X"—a treatment with which plaintiffs agree.

[4] Export value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, which reads as follows:

    (b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

We turn now to the record which consists of the oral testimony of Alan Shure who in 1965 was vice-president in charge of engineering, purchasing and manufacturing operations for the importer, Strombecker Corp., and an affidavit executed by Akio Onishi, president of the Onishi Company of Japan, the buying agent of the importer.[5] Shure's testimony is to the following effect: The importer, Strombecker, is a manufacturer of a die cast line of toys which it markets under the name "Tootsie Toy." It also manufacturers model racing sets and hobby kits under the Strombecker name. In May 1961, Shure went to Japan on behalf of Strombecker to initiate the importation of component parts for its products and engaged the Onishi Company of Japan as buying agent. The duties of Onishi were to handle the exportation of merchandise Shure purchased from producers; perform shipping and collating services; and act as translator.

Since 1961, Shure visited Japan some forty times to develop the products and to work with the manufacturers. Normally, he visited the manufacturer's factory, but on occasion he worked out of the Onishi office in Tokyo. He met with the principals of the manufacturers involved in this case to discuss the ex-factory pricing of the merchandise, and quality and delivery problems, and the prices shown on the invoices were those he negotiated with the various manufacturers. Although the Strombecker Corp., on occasions, had target prices, in most cases it was the seller's decision as to what price would be quoted, and it was then Strombecker's decision as to whether to buy or not. However, its objective was to negotiate a price.

The affidavit of Akio Onishi is to the following effect: The business of the Onishi Company is to act as buying agent for foreign buyers of Japanese products, including Strombecker. When Shure, on behalf of the Strombecker company, would visit Japan, he, in the affiant's presence, would hold conferences with various manufacturers and negotiate a price. In between visits, Shure would send instructions to Onishi which would then contact various manufacturers, explain Shure's requirements, obtain price quotas and samples, and convey the same to Shure. If the price arrangements were satisfactory, Shure would so advise Onishi which in turn would advise the manufacturer.

The "unit" prices shown on the invoices involved here represented a unit price delivered in Tokyo at the Onishi warehouse. The inland charges shown on the invoice were incurred after delivery of the goods by the manufacturer. They were paid by Onishi direct to an independent trucking and freight forwarder for moving the merchandise to the point of embarkation and loading it on board the vessel, with

---

[5] The government has conceded that the Onishi Company was the buying agent of the importer in these cases.

no portion thereof going to any manufacturer. The charges were incurred for the account of Strombecker, and the latter in turn reimbursed Onishi therefor.

The above-described method of doing business in purchasing for Strombecker is the same as that utilized by various other United States purchasers whom Onishi represents. The affiant adds that the manufacturers identified on the invoices here in dispute offer and sell their line of merchandise to all purchasers who care to buy on the same basis as Strombecker, that is, delivered to the Onishi warehouse. The affidavit further states that other manufacturers of toys in the principal markets with which Onishi deals also offer and sell their merchandise to any purchaser who cares to buy on the same basis.

The record thus shows that the unit prices shown on the invoices included the cost of delivery from the manufacturer's place of business to the warehouse of the buying agent—Onishi—in Tokyo; that the inland charges here in issue were incurred for the account of the importer—Strombecker—after delivery by the manufacturers to the importer's buying agent; and that no part of such charges were incurred by the manufacturers as sellers.

This brings us to the legal aspects. We start with the general principle that "[i]f ex-factory prices and other charges are separately stated on the invoices and the appraiser's finding of value is expressed in terms of the invoice unit prices, plus the questioned charges, the appraisement is deemed to be separable. * * * [In such circumstances], a party to a reappraisement proceeding may challenge one or more of the elements entering into an appraisement, while relying upon the presumption of correctness of the appraiser's return as to all other elements, whenever the challenged items do not disturb the effect of the remainder of the appraisement. Such is the case in the instance of an appraisement at ex-factory-plus-charges value, and the charges may be disputed without the necessity of proof that the ex-factory prices comply with the statutory definition of export value. * * * "United States v. Supreme Merchandise Company, 48 Cust. Ct. 714, 716–17, A.R.D. 145 (1962). See also e.g., United States v. Chadwick-Miller Importers, Inc., et al., 54 CCPA 93, C.A.D. 914 (1967); United States v. Bud Berman Sportswear, Inc., 55 CCPA 28, C.A.D. 929 (1967).[6]

An additional consideration important to note is that if separability is applicable, it is not necessary for the importer to show that other purchasers could have bought the merchandise at the same

---

[6] The term "ex-factory" is used synonymously with the ex-warehouse basis of selling here. It refers to a situation in which the importer has negotiated a firm price with the seller, be it ex-factory or ex-warehouse, takes delivery, and thereafter incurs expenses for his own account through his agent in the country of exportation.

ex-factory prices paid by that importer. For "the separability rule will give rise to a presumption that the ex-factory *price* which the appraiser found was *the* price at which the merchandise was freely sold or offered to all." *United States* v. *Pan American Import Corp.*, *et al.*, 57 CCPA 134, C.A.D. 993, slip op. July 23, 1970, p. 8. [Emphasis in original.] See also e.g., *United States* v. *Chadwick-Miller Importers, Inc.*, *et al.*, *supra*, 54 CCPA at 95; *United States* v. *Bud Berman Sportswear, Inc.*, *supra*, 55 CCPA at 29. However, as emphasized in the recent decision of the appellate court in *Pan American*, before separability may be invoked, it is first necessary for the importer to show that such or similar merchandise was freely sold or offered for sale to *all* purchasers on *an* ex-factory basis. *United States* v. *Pan American Import Corp.*, *et al.*, *supra*, slip op. pp. 8–9. For the reasons that follow, it must be concluded that on the basis of the present record, plaintiffs have failed to meet this burden of proof.

To begin with, Shure's testimony makes no reference whatever as to how sales were made to anyone other than the plaintiffs or how any other manufacturer of such or similar merchandise sold or offered his product. The only statements in the record concerning these matters are contained in Onishi's affidavit, as follows:

> 20. From my observations and experience, the above-described method of doing business in the purchase of toys for the account of Strombecker Corporation is the same as that utilized by various other United States purchasers whom we represent, such as Art Line Associates, Inc. of Chicago and M. Pressner & Co. of New York. The manufacturers identified on our invoice numbers 1000/185 and 1000/191 offer and sell their line of merchandise to all purchasers who care to buy on the same basis as to Strombecker Corporation, that is, delivered to our warehouse. Other manufacturer [sic] of toys in the principal markets with whom we deal also offer and sell their merchandise to any purchaser who cares to buy on the same basis.

These statements, however, are conclusory and, as such, have no probative value. Lacking, for example, is any evidentiary basis for the statement in the affidavit that the manufacturers of the merchandise in question offer and sell their line of merchandise to all purchasers who care to buy on the same basis as to Strombecker. Similarly without evidentiary basis is the statement that other manufacturers of toys with whom Onishi deals also offer their merchandise to any purchaser who cares to buy on the same basis. Nor can it be determined from the record whether other manufacturers of such or similar merchandise sold f.o.b. or ex-factory. It is true that "the courts are disposed to adopt a lenient view toward the quantum of proof requisite to establish ex-factory sales exclusive of disputed charges." *Hub Floral Manufacturing Company* v. *United States*, 62

Cus. Ct. 979, 984, A.R.D. 249 296 F. Supp. 355 (1969), *aff'd United States* v. *Hub Floral Manufacturing Company*, 57 CCPA 134, C.A.D. 993, slip op. July 23, 1970. Thus, as the court pointed out in *Hub Floral*, it is sufficient if "a climate has been established of sales to * * * [the importer] by many different manufacturers of a variety of merchandise at ex-factory prices." 62 Cust. Ct. at 985. See also e.g., *United States* v. *Dan Brechner & Co.*, 38 Cust. Ct. 719, A.R.D. 71 (1957). But even under the most lenient view as to the necessary quantum of proof, the statements in the Onishi affidavit fall far short of establishing a similar climate here.

In summary, it is concluded (1) that in R66/21838 and R66/21841, plaintiffs have not met their burden of proof and, accordingly, the values found by the appraiser are affirmed; (2) that in R66/19895, no proof was presented to overcome the *per se* appraisement of two cartons of No. 40536 motors covered by the invoice dated August 3, 1965, and the value found by the appraiser is therefore affirmed; and (3) that the remaining 29 cartons of motors involved in R66/19895 have not been appraised and to this extent the appeal is dismissed as premature. Judgment will be entered accordingly.