LMI—LA METALLI INDUSTRIALE, S.p.A., Plaintiff-Appellant,

v.

The UNITED STATES, American Brass, Chase Brass & Copper Company, Hussey Copper Ltd., The Miller Company, Olin Corporation—Brass Group, Revere Copper Products, Inc., The International Association of Machinists & Aerospace Workers, The International Union, Allied Industrial Workers of America (AFL–CIO), The Mechanics Educational Society of America (Local 56), and The United Steelworkers of America (AFL–CIO/CLC), Defendants-Appellees.

No. 89–1532.

United States Court of Appeals, Federal Circuit.

Aug. 17, 1990.

David O. Elliott, Barnes, Richardson & Colburn, New York City, argued, for plaintiff-appellant. With him on brief, was Josephine Belli.

M. Martha Ries, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for defendant-appellee, U.S. With her on brief, were Stuart E. Schiffer, Acting Asst. Atty. Gen. and David M. Cohen, Director. Also on brief, were Wendell L. Willkie, II, Gen. Counsel, Stephen J. Powell, Chief Counsel for Import Admin. and Robert E. Nielsen, Atty. Advisor, Office of Chief Counsel, U.S. Dept. of Commerce, Washington, D.C., of counsel.

Jeffrey S. Beckington, Collier, Shannon & Scott, Washington, D.C., argued, for defendants-appellees. With him on brief, were David A. Hartquist and Carol A. Mitchell.

Before NIES, Chief Judge,* NEWMAN and MICHEL, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

LMI–La Metalli Industriale, S.p.A. (hereinafter "LMI") appeals the judgment of the United States Court of International Trade, *LMI–La Metalli Industriale, S.p.A. v. United States*, 712 F.Supp. 959 (Ct. Int'l Trade), *motion denied*, 720 F.Supp. 176 (1989) (motion to enjoin liquidation of entries pending appeal denied), which affirmed the determination of the Department of Commerce International Trade Administration ("ITA") that sales of brass sheet and strip from Italy were at less than fair value. *Brass Sheet and Strip from Italy*, 52 Fed.Reg. 816 (Dep't Comm.) (final determination), *amended*, 52 Fed.Reg. 11,-299 (1987). LMI challenges four of the rulings on which the determination was based, *viz.*, the rate of the imputed cost of credit and the denial of circumstances of sale adjustments for home market selling commissions, pre-sale inventory expenses, and currency hedging expenses.

## OPINION

██ We review the decision of the Court of International Trade for the correctness of that court's review of the findings and holdings made by the ITA in the course of its administrative determinations. *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1559 n. 10 (Fed.Cir.1984). By statute, 19 U.S.C. § 1516a(b)(1)(B), the Court of International Trade shall hold unlawful any determination, finding, or conclusion of the ITA that is unsupported by substantial evidence on the record or otherwise not in accordance with law.

The ITA's determinations of foreign market value and United States price are governed by statute and regulation. The part

* Chief Judge Nies assumed the position of Chief Judge on June 27, 1990.

here pertinent of 19 U.S.C. § 1677b(a)(4)(B) states:

> (4) *Other Adjustments*—In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to—
>
> \*       \*       \*       \*       \*       \*
>
> (B) other differences in circumstances of sale;
>
> \*       \*       \*       \*       \*       \*
>
> then due allowance shall be made therefor.

Implementing this section, 19 C.F.R. § 353.15 (1988) provides:

> (a) *In general.* In comparing the United States price with the sales, or other criteria applicable, on which a determination of foreign market value is to be based, reasonable allowances will be made for bona fide differences in the circumstances of the sales compared to the extent that it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.
>
> (b) *Examples.* Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms. . . . Reasonable allowances also generally will be made for differences in commissions.

*Home Market Inventory Carrying Costs*

■ The Court of International Trade affirmed the ITA's denial of a circumstances of sale adjustment for LMI's pre-sale inventory expenses.

The ITA found that LMI's inventory carrying costs did not "bear a direct relationship to the sales which are under consideration," 19 C.F.R. § 353.15(a), in that the warehousing costs were incurred before sale and thus were deemed not directly related to domestic sales, and further that LMI, in providing only its average cost of carrying its entire inventory, did not relate that cost directly to domestic sales of brass sheet and strip.

The facts on which the ITA's findings were based were disputed, LMI asserting that its inventory of finished products is maintained solely to service the requirements of its customers in Italy, that no warehousing is required for exported products, which are made to order, and therefore that the entire warehousing cost is directly related to domestic sales. In *Asahi Chemical Industry Co. v. United States*, 692 F.Supp. 1376 (Ct. Int'l Trade 1988), *reh'g granted, dismissed as moot*, 727 F.Supp. 625 (1989) the court applied the principle that warehousing expenses that were shown to be related solely to products for home market customers were allowable as a circumstances of sale adjustment.

However, LMI directs us to insufficient evidentiary support for its position that only products for home market sales were carried in inventory, as distinguished from the facts in *Asahi*. The ITA's findings are in accord with the analysis stated in *Malleable Cast Iron Pipe Fittings, Other Than Grooved, From Brazil*, 51 Fed.Reg. 10,897, 10,900 (Dep't Comm.1986) (final determination of sales at less than fair value):

> Maintaining an inventory is a general cost of doing business and, therefore, is not considered directly related to particular sales. Moreover, [respondent's] inventory warehousing costs are figured based on the average inventory turnover for merchandise sold in the home market. These costs may vary on a sale by sale basis depending on the products requested by [respondent's] home market customers. Therefore, average inventory costs are not necessarily [a]n accurate measure of possible post-sale inventory costs incurred while out-of-stock fittings are produced.

We conclude that substantial evidence supports the ITA's determination that

warehousing costs were not attributable solely to home market sales of the goods under investigation. The ruling on this point is affirmed.

### Currency Hedging Expenses

■ The Court of International Trade affirmed the ITA's denial of a circumstances of sale adjustment for hedging expenses, on the basis that these costs were a general expense and not sufficiently related to sales in Italy of brass sheet and strip. LMI states that these expenses were incurred solely in connection with home market sales, and that they satisfy the congressional intent that circumstances of sale adjustments "should be permitted if they are reasonably identifiable, quantifiable, and directly related to the sales under consideration." H.R.Rep. No. 317, 96th Cong., 1st Sess. 76 (1979). *See* 19 U.S.C. § 1677b(a)(4)(B).

LMI buys copper and zinc and other raw materials used in the manufacture of brass, on the world market. These purchases are required to be made in hard currency. LMI hedges the dollar cost of these materials by purchasing forward currency contracts. LMI explains that these hedging contracts assure that the payment it ultimately receives in lire, on its home market sales, will not decline in value relative to the dollar cost of the raw materials, by guaranteeing the availability of dollars at the rate of exchange in effect when the home market sale price is set.

The ITA, holding that the currency hedging costs were general operating expenses, argues that there was no segregation of the hedging expense for raw materials used in brass sheet and strip sold in the home market, and that for materials used for exported products. LMI responds that there is no need for dollar hedging for products intended for sale in the United States, for the sales value is not subject to erosion by changes in the relative values of the dollar and the lira; that the sole reason for incurring the cost of hedging is because of sales in the home market, and thus that the hedging expense should fairly be allocated to home market sales.

Although LMI argues that only the goods sold in Italy reflect these expenses, the ITA requirement was reasonable that LMI show a direct relation between its dollar hedging costs and sales in Italy of the products under investigation. On reviewing the record and argument, we conclude that substantial evidence supports the ITA's conclusion that this showing was not made. *See Ipsco, Inc. v. United States*, 687 F.Supp. 633, 642 (Ct. Int'l Trade 1988) (requiring that each expense be related to sales of the products under investigation).

The ruling denying allowance of currency hedging expenses is affirmed.

### Home Market Selling Commissions

■ Allowances for differences in commissions are specifically contemplated in 19 C.F.R. § 353.15, *supra*. However, the ITA denied any adjustment for commissions paid by LMI to Pontinox Metallitalia S.R.L. ("Pontinox"), a wholly owned Italian subsidiary of LMI. LMI claims that Pontinox is a *bona fide* sales agent, established and operating in full accord with agency principles.

The ITA stated that its policy is to deny adjustment for commissions paid to a related party unless either of two conditions is met:

> We have accepted commissions to related parties only when we have determined that those commissions were arm's length or where the commissions are directly related to particular sales under review.

52 Fed.Reg. at 818. LMI states that either and both of the ITA's conditions were met: that the commissions were at arm's length, and directly related to the sales under review. Since we agree with LMI, we need not consider the appropriateness of the ITA's standard.

In *Bushnell Int'l, Inc. v. United States*, 477 F.2d 1402, 1406 (CCPA 1973) the court, discussing the common ownership of a manufacturer and an agent, held that all the circumstances must be considered in determining whether the agent's commis-

sions were excludable from determination of export value:

> [T]he business ties between the manufacturer and the agent are not necessarily determinative of the status of commissions the importer paid the agent but the question must be determined by the full circumstances as revealed by the evidence at hand.

Although the ITA's presumption against the *bona fides* of commission arrangements in parent-subsidiary relationships serves to place on the foreign company the burden of coming forward with evidence, in this case LMI has provided data showing its agency arrangements in other countries and the actual commissions paid to Pontinox. At verification, LMI presented source documents used to calculate the total payments to Pontinox as a percentage of total LMI Italian sales of products under investigation and other flat-rolled products. The record shows that the ITA verified that all brass sheet and strip sales in Italy were made through Pontinox. In addition, the ITA verified the amounts paid to Pontinox in administrative expenses and commission payments, as well as the percentage of Italian sales paid to Pontinox.

The ITA held that LMI's commissions to Pontinox were not adequately shown to be directly related to the sales of the brass sheet and strip under investigation. LMI argues that although Pontinox indeed served as sales agent for products of LMI other than those here under investigation, the commission rate was the same for all products, and therefore segregation by product was unnecessary in order to show this direct relationship. The government does not argue otherwise, but instead offers hypothetical suggestions of possible abuse. No evidence has here been presented of abuse. LMI made all of its relevant information available for ITA inspection. We have been offered no logical support for the position that because Pontinox acted as agent for other products, this must defeat recognition of the commission paid on sales of the products under investigation.

The cited authority, *e.g.*, *Drycleaning Machinery from West Germany*, 50 Fed. Reg. 32,154 (Dep't Comm.1985), does not support the government's purported distinction of how the commissions were measured and paid. In *Drycleaning Machinery*, as in the Pontinox arrangement, the commission was paid as a percentage of sales by the agent, and the agent was responsible for selling expenses. Similarly in *Egg Filler Flats from Canada*, 50 Fed. Reg. 24,009 (Dep't Comm.1985) (final determination), the agent paid its sales-related expenses, and the principal paid a commission measured as a percentage of the sales price. It is not material whether the agent also handled other goods when the commission rate was the same, and the government has not offered a reasonable explanation for its position.

These circumstances are analogous to those considered by the courts in connection with the determination of export value. The *bona fides* of a buying commission for the purpose of determining its non-dutiable status "is a question of fact to be determined from the evidence adduced in any particular case." *Vicki Enterprises, Inc. v. United States*, 67 Cust. Ct. 480, 487, R.D. 11750 (1971), *aff'd*, 343 F.Supp. 1381, 1386 (Cust. Ct.1972), *aff'd*, 496 F.2d 1403 (CCPA 1974) (quoting *United States v. Supreme Merchandise Co.*, 48 Cust. Ct. 714, 717, A.R.D. 145 (1962)). The status of the buying agent must be established by a preponderance of the evidence. *Id.* For example, in *Vicki Enterprises* the court held that uncontroverted testimony on the nature of the agency relationship, supported by a written agreement, sufficiently demonstrated the *bona fides* of the buying commission payments. 67 Cust. Ct. at 512, R.D. 11753. A similar result obtained in *Dorco Imports v. United States*, 67 Cust. Ct. 503, R.D. 11753 (1971) and *J.C. Penney Purchasing Corp. v. United States*, 451 F.Supp. 973, 983 (Cust. Ct.1978). We discern no significant difference between consideration of the *bona fides* of commissions in determining export value and in determining foreign market value.

The Court of International Trade speculated that a manufacturer could influence

the measure of foreign market value by manipulating the commission payments to a related sales agent. Manipulation may be possible, but speculation as to its existence must yield to evidence. When all of the circumstances are considered, *see Bushnell Int'l*, 477 F.2d at 1406, we conclude that Pontinox was, on the record before us, the *bona fide* agent of LMI. The record does not contain substantial evidence supporting the ITA's finding that the requisite arm's length relationship was absent or that the commissions were not directly related to the sales under review.

The denial of a circumstances of sale adjustment for differences in selling commissions is reversed.

## Imputed Credit Cost

■ The imputation of credit cost is based on the principle of the time value of money, and thus the ITA held that since LMI stated no finance charge to the United States buyer for the period between shipment of the goods and payment therefor, LMI would be charged with having provided financing to the buyer. LMI did not incur debt by borrowing in order to finance its United States receivables, and the ITA imputed a credit cost measured from the date of the invoice to the date of LMI's receipt of payment. This imputation served to reduce the relative value to LMI of its United States price. LMI does not now challenge the imputation of credit cost, but states that it was assessed at an erroneous rate.

### A

The imputed interest was assessed at the Italian lira-denominated borrowing rate of approximately 16%. The ITA position is that it correctly imputed credit costs on United States sales using the home market short-term financing rate, and that it is not relevant whether LMI could actually have obtained short-term dollar financing for these sales. LMI states that the assessment of imputed interest at the cost of credit in the Italian market, as applied to LMI's United States sales, is not reasonable. LMI states that had it required credit financing for product sold in the United States, it would have done so at the prevailing rate for United States dollars, then about 9.5%. LMI states that it is reasonable that the financing of receivables would be done in the currency of the place of purchase, and that it is entirely unreasonable that financing would have been done at almost twice the available rate. It was pointed out that LMI's United States customers could have obtained dollar financing had LMI demanded immediate payment, and that it was not reasonable to impute a charge much greater than that which could actually have been obtained.

While the government argues that it would normally be expected that an Italian company would seek financing from a financial institution in Italy, we agree with LMI that it is not reasonable to presume that a commercial enterprise would borrow at almost twice the available rate. In addition, LMI provided evidence that it had obtained dollar-denominated loans; the ITA Verification Report states as follows:

> The verifying officers did, however, find several U.S. dollar short-term loans outstanding during the period of investigation to finance purchases of imported raw materials. These rates are slightly lower than the rates from the Federal Reserve. The following table summarizes the bank documents, including interest rates, principal amounts, etc. The length of these loans ranged from 7 to 30 days....

The rates shown were all lower than the 9.5% dollar rate attributed to the period. The ITA dismissed this evidence, stating that these loans were made to finance dollar purchases of raw materials, not dollar sales of finished products.

The government's position is that ITA methods do not have to conform to commercial practice. This position is internally inconsistent, however, because the imputation of credit cost itself is a reflection of the time value of money, and hence commercial practice. The time value of money is not an arbitrary fiction, but must correspond to a dollar figure reasonably calculated to account for such value during the

gap period between delivery and payment. If the cost of credit is imputed in the first instance to conform with commercial reality, it must be imputed on the basis of usual and reasonable commercial behavior.

In this case the ITA presumed that LMI would borrow in Italy to finance its United States receivables, no matter how unfavorable the rate and whatever the available alternatives. Such a presumption does not withstand scrutiny. We conclude that the record does not contain substantial evidence supporting the ITA's assessment of a lira-denominated interest rate for the imputed cost of credit.

### B

Before the Court of International Trade, LMI presented the argument that Italian law mandated the financing of transactions invoiced in foreign currency with foreign currency loans, this mandate applying to 50% of such financing during parts of 1984–85 and 75% for the latter half of the period of investigation. Finisterial Decree—Law of January 16, 1986, *Gazzetta Ufficiale della Repubblica Italiana* No. 13 (January 17, 1986). LMI argued that this law, which is designed to reduce currency speculation, supports its position that it was unreasonable for the ITA to impute financing at the lira-denominated rate, because such credit costs could not in fact have been incurred without placing LMI in violation of Italian law.

The Court of International Trade held that because LMI did not raise this argument before the ITA, it was precluded from raising it before the court. LMI states that it was not raising a new issue or presenting new facts, but was raising a point of law in support of a claim already at issue on facts in the agency record. *See* Fed.R.Civ.P. 44.1 (the determination of foreign law "shall be treated as a ruling on a question of law.") Since we have decided this issue in LMI's favor on other grounds, we need not decide whether this argument was properly foreclosed from consideration.

The imputation of interest at the lira-denominated borrowing rate is reversed.

### Conclusion

The decision of the Court of International Trade is affirmed as to inventory carrying costs and currency hedging expenses, and reversed as to home market selling commissions and imputed costs of credit. The matter is remanded for further proceedings in accordance herewith.

No costs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.