(C. D. 1182)

## W. Stuart Smith v. United States

United States Customs Court, Third Division

(Decided July 18, 1949)

*John C. Ray* for the plaintiff.

*David N. Edelstein*, Assistant Attorney General (*Howard L. Harawitz*, special attorney), for the defendant.

Before Cline, Ekwall, and Johnson, Judges

Ekwall, Judge: A quantity of tawny port wine, described as EMU 999, was imported from Australia and entered at the port of Detroit, Mich., on November 20, 1945. The collector of customs assessed customs duty thereon under the provisions of the Tariff Act of 1930, which assessment is not in issue here. There was also levied an internal revenue tax of $2 per wine gallon under the provisions of title 26, section 3030, Internal Revenue Code, as amended by section 1650 of the same title. This assessment was levied upon a finding by the collector that the wine had an alcoholic content in excess of 21 per centum absolute alcohol. The importer, the plaintiff herein, filed suit claiming that the alcoholic content of the wine is less than 21 per centum, and therefore he contends internal revenue tax of only 60 cents per wine gallon under said section 3030 should have been levied.

The statute involved provides for assessment of $2 per gallon on still wines "Over 21% and not over 24% of Alcohol" and 60 cents per gallon on still wines "Over 14% and not over 21% of Alcohol."

In support of his claim, plaintiff introduced the testimony of two expert witnesses, Mr. William C. Geagley, chief chemist for the Michigan Liquor Control Commission, and Mr. Charles E. Greenlaw, chemist employed by the Detroit Testing Laboratory. On behalf of the defendant, the appraiser of merchandise at the port of Detroit, Mr. Theodor Hurwitz, and a chemist from the U. S. Customs Labora-

-tories at Chicago, Ill., testified. Five exhibits were also introduced, viz, a sample bottle of the imported wine with label, together with three documents showing the results of chemical analyses, and a rough sketch of a pycnometer, an instrument used in making the analyses.

The plaintiff, testifying on his own behalf, stated that he has been importing this type of wine since 1943 and is the sole importer thereof; that he submitted two bottles from this importation for analysis as to alcoholic content to the Detroit Testing Laboratories in January 1946 and two additional bottles in March 1946. Later on, in June 1946, he submitted two additional samples to Mr. Geagley, chief chemist for the Michigan Liquor Control Commission. He further testified that he had discussed the question of the alcoholic content of the wine with the U. S. Appraiser at Detroit, and in January 1946, as a result of that discussion, he delivered to the appraiser two additional samples for analysis. Subsequent to the analysis of these samples, he delivered to the appraiser samples in April 1946, one bottle party filled, which had previously been analyzed by the Detroit Testing Laboratory.

On cross-examination plaintiff testified that he was advised that the laboratory analyses of the original samples taken by the appraiser showed an alcoholic content of over 21 per centum by volume. The four samples submitted by him to the appraiser were also analyzed by the U. S. Customs Laboratory in Chicago and as a result of tests showed an alcoholic content of over 21 per centum.

The two chemists whose testimony was produced on behalf of the plaintiff described the processes used by them in making their analyses of the samples. The first of these witnesses, Mr. Geagley, was the chief chemist for the Liquor Control Commission and also for the Michigan Department of Agriculture, Food and Drug Department; his duties consisted of acting as technical advisor to the commission and also performing all the analytical work pertaining to alcoholic beverages, including the ascertainment of their alcoholic content. He testified in detail as to the method used in analyzing the samples of wine similar to exhibit 1, the instant merchandise, and stated that in making his analyses he followed the methods outlined in the Book of Methods, sixth edition, published by the Association of Official Agricultural Chemists, which will be hereinafter referred to as A. O. A. C. It was conceded by counsel for the plaintiff in the brief filed that this was a mistake and that the book used was the fifth edition of that work. As a result of the analyses, he found that the two samples tested 20.8 per centum and 20.7 per centum, respectively. He also stated that the commission is interested in the label on the bottles because if the claims appearing thereon are untrue, the commission will not allow the product to be sold in the state of Michigan. How-

ever, a tolerance of 1 per centum is allowed so that a wine containing 21 per centum of alcohol may be labeled as a 20 per centum wine. This witness admitted on cross-examination that he first sampled the imported wine some 6 months subsequent to importation; that he did not know where the wine was kept or what was done to it in that 6-month period. He described in detail the method of analysis, made under his supervision.

Mr. Charles E. Greenlaw testified that he made analyses for alcoholic determination of seven samples similar to exhibit 1, the imported merchandise, between the dates of December 1945 and May 1946; that he used the method prescribed by the fifth edition of the A. O. A. C., the sixth edition not being available at that time. The percentages of alcohol by volume found by him were 20.9 in December 1945; 20.3 and 20.05 on the two samples received in January 1946; 20.0 and 20.18 on the two February samples; and on the two received in May 1946, the findings were 20.42 and 20.46 per centum. The witness stated that he advised the chief chemist at the customs laboratory in Chicago that he was unable to understand the variation in these analyses. When interrogated on cross-examination, this witness was unable to state whether his analyses, other than the two in February 1946, were of the wine in question, or the EMU 444 type (also involved in this importation, but not in dispute), nor did he know whether any of the samples he received were from the shipment in question here. This witness also described in detail the method used in making analyses of the samples. In all of his tests, Mr. Greenlaw used 50 cc. of wine instead of 100 cc. because, he stated, he found that quantity better to work with. In reaching his determination he multiplied his results by 2, since 100 cc. is the standard basis. He admitted that any errors that might occur in his tests would be doubled when he converted over to a 100 cc. basis. The analysis made by him in December 1945, was at 15.56° centigrade and the six others at 20°. In answer to a question, he stated that in the case of two identical flasks of identical volume, each filled with the same wine, but at different temperatures, one at 60° F. and the other at 80° F., the one at the lower temperature will contain a greater quantity of alcohol because there will be more grams of liquid in that portion.

On redirect examination he stated that he believed that of the seven samples submitted to him for analysis one was of the EMU 444 species but he did not know which one it was. He knew that the two samples analyzed in February were EMU 999. Aside from these two he was not certain of the species since they contained no number.

The importer was recalled to the stand but we do not consider his testimony in connection with the labeling of this wine to be entitled to much consideration in view of the testimony in the record that a.

tolerance of 1 per centum is allowed by the State Liquor Commission of Michigan with the result that a wine containing 21 per centum of alcohol may be labeled as a 20 per centum wine.

The Government appraiser of merchandise at the port of Detroit testified on behalf of the defendant and stated that he did not make his advisory classification of this merchandise until after he had received analyses of a number of samples.

Government witness, Mr. Harold Salwin, a chemist who made the analyses which were considered by the appraiser in making his advisory classification of the wine in suit, stated that in making his analyses he used two methods, one known as N. Y. number 165 and the other as Customs Method number 811.1–45. He described these methods in detail. He testified that the method 811.1–45 is the one currently recommended by the Customs Bureau Division of Laboratories and that the method prescribed by the fifth edition of A. O. A. C., which was used by plaintiff's chemists, was no longer recommended by the A. O. A. C. because of its inherent errors. The changes in the earlier method were incorporated in the sixth edition of the A. O. A. C. and closely correspond to the 811.1–45 method. Mr. Salwin had made some two or three thousand analyses of wine and liquor prior to the ones made of the instant importation. He gave it as his opinion that all of errors inherent in the New York 165 method have been removed by the 811.1–45 method, which latter he considers a perfect test under normal laboratory conditions.

This witness further testified that the lapse of time between importation and analysis of wine may make a difference in its alcoholic content inasmuch as it is apt to lose alcohol by evaporation on standing. In making his first analysis, he used the New York 165 method because at that time no dispute as to the alcoholic content of this wine had arisen. However, after the dispute arose, he used both methods on all subsequent samples. The lowest per centum obtained by him on any of his analyses was 21.08 and the highest 21.23.

The results of the various analyses made by Mr. Salwin, as shown by the exhibits, show a variance of only 0.1 per centum, whereas the tests made by Mr. Greenlaw, covering the same period—with the exception of his last analysis made in May 1946—show variances of from 0.05 per centum to 0.46 per centum. The analyses made by Mr. Geagley, which were under date of May 29, 1946, showed a variance of only 0.1 per centum. But it is noted that this witness testified that he sampled the wine some 6 months after importation; that he did not know where the sample was kept or what was done to it in that 6-month period.

Certainly the results of the Government chemist's analyses are much more uniform than those of plaintiff's chemists.

It is contended on behalf of the plaintiff that the weight of the

evidence preponderates in his favor. In support of this contention, plaintiff contrasts the training, experience, and qualifications of his witnesses with those of the Government chemist. We are unable to find that because the plaintiff's chemists had been engaged for a longer period of time in conducting analyses, that fact necessarily entitles their evidence to more weight than that of the Government chemist. Other important factors enter into a determination of the weight to be accorded the testimony. The record discloses that the method used by the Government chemist in his analyses is an improvement upon and is more accurate than the method used by the outside chemists and that it was developed by experimentation and conferences and was finally adopted by the Customs Bureau Division of Laboratories. Moreover, it is the method prescribed in a later edition of an admitted authority, the sixth edition of the A. O. A. C. Neither the technique nor the methods employed by the Government chemist have been impeached and we are impressed with the accuracy of the Government method as disclosed by the detailed testimony of Mr. Salwin.

Plaintiff advances two further claims, i. e., (1) that the court consider the invoice as evidence on the question of alcoholic content of this wine; and (2) that the statement on the label that the alcoholic content is 20 per centum by volume be weighed in plaintiff's favor. A discussion of these claims is unnecessary for the reason that neither invoice statements nor a label could outweigh positive, unrefuted testimony as to the accuracy of the method used in analyzing the samples of this wine.

On the record it appears that plaintiff has failed to establish that the collector was in error in his finding that this wine had an alcoholic content in excess of 21 per centum absolute alcohol, and therefore was properly assessable with internal revenue tax of $2 per wine gallon under section 3030, title 26, Internal Revenue Code, as amended by section 1650 of the same title.

Judgment will, therefore, be rendered for the defendant overruling plaintiff's claim.