(Reap. Dec. 11073)

LOLLYTOGS, LTD. v. UNITED STATES

Entry No. 758147, etc.

(Decided September 29, 1965)

Siegel, Mandell & Davidson (Allan H. Kamnitz and Joshua M. Davidson of counsel) for the plaintiff.

John W. Douglas, Assistant Attorney General (Alfred A. Taylor, Jr., Herbert L. Warren, and Charles P. Deem, trial attorneys), for the defendant.

RAO, Chief Judge: The appeals for reappraisement enumerated in the schedule attached hereto and made a part hereof have been consolidated for purposes of trial. They relate to several importations of children's clothing from Hong Kong, which articles were entered at their invoice unit prices per dozen, f.o.b. Hong Kong. They were appraised in all instances at their invoice unit prices, plus $4\frac{1}{2}$ per centum.

Both parties to this action agree that export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper statutory basis for the valuation of the merchandise at bar. This provision reads as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

The basic point of contention between the parties hereto is addressed to the $4\frac{1}{2}$ per centum item which the appraiser added to the invoice unit values and which plaintiff claims is a bona fide purchasing commission and, hence, not a part of the export value of the instant merchandise.

In support of this contention, plaintiff introduced into evidence two affidavits of the managing director of The Swedish Trading Co., Ltd., of Hong Kong, the alleged purchasing agent (hereinafter called Swedish Trading), which were received as plaintiff's exhibits 1 and 2, and the oral testimony of Mr. Alfred J. Sutton, an officer and director of the plaintiff company, as well as its overseas buyer. The record

also contains a report of Mr. Smith B. Griffin, the senior customs representative, stationed at Tokyo, Japan, received in evidence on behalf of defendant, as defendant's exhibit A.

It appears from the testimony of Mr. Sutton that in his capacity as overseas buyer for the plaintiff he was responsible for all foreign purchases and the negotiation of all terms in connection therewith. His business was conducted directly with the manufacturers who produced the merchandise in issue with the assistance of a representative of Swedish Trading. Mr. Sutton stated that he first contacted Swedish Trading in November 1958, at which time arrangements were made for it to assist him in the purchase of children's wear in Hong Kong. The oral understanding between the two companies in connection with this service was reduced to a writing, designated by the parties as "Purchasing Agency Agreement," in May 1960. A copy of this agreement is attached to plaintiff's exhibit 2. It sets forth the functions and obligations of Swedish Trading as outlined in part by the witness in the following testimony:

A. We would go together to the manufacturer, as I say, cotton knit shirts— one of the items we purchased. We had a sample that we liked. We would discuss the colors and the way I would like it packed and the type of carton we would use in the normal business procedure and if it looked right and the price was agreeable, I would purchase the item. Basically, that would be then a purchased item. Then, Swedish Trading would make up a contract to conform to that purchase. They would make the contract with me and also with the manufacturer of which I have a copy.

Q. Are these so-called back to back contracts?—A. Yes they are.

Q. I show you Plaintiff's Exhibit 2, which is in evidence and I invite your attention to the two other attachments to that exhibit, one of which is called sales contract and the other which is called purchase contract and ask you whether these are the contracts to which you have just testified that Swedish Trading made up?—A. This is representative of the back to back contract.

Q. Now, do I understand that after you have arranged and negotiated the purchase with the manufacturer, a contract is drawn similar to the purchase contract that is attached to Exhibit 2 between Swedish Trading and the manufacturer?—A. Yes.

Q. And, does that contract spell out all the details and the terms of the arrangement?—A. Well, actually the contract represents the merchandise that we purchased.

Q. Does it represent the price?—A. Yes.

Q. Does it represent the packing?—A. Yes.

Q. So that it represents all of the details?—A. Yes.

Q. On whose behalf does the Swedish Trading enter into this arrangement with the purchaser? Does it enter on its own behalf or on behalf of Lollytogs and you may refer to the exhibit to refresh your recollection?—A. This represents Lollytogs.

Q. Do I understand you to say that the Swedish Trading enters this on behalf of Lollytogs?—A. Yes.

It was further established that the so-called back-to-back contracts incorporate precisely the same terms that appear on the invoices in issue herein.

As to the duties and functions of Swedish Trading, the witness stated that it checks production and packing, arranges for shipment to the United States, and, in general, makes sure that everything is going according to schedule. It also acts as "payment master," with funds derived from letters of credit opened to its account. For these services, Swedish Trading received a commission amounting to 4½ per centum of the ex-factory price, which sum was deducted from the letter of credit at the time of shipment.

Mr. Sutton further testified that Swedish Trading assumed no responsibility for loss or damage in connection with the production or shipment of the merchandise. Complaints, if any, were made directly to the foreign manufacturer. The services of Swedish Trading were engaged because someone was needed to check on the merchandise, and it was not feasible for plaintiff to have a representative continuously in Hong Kong. However, it was at all times possible to purchase such or similar merchandise directly from the various manufacturers without the intervention of a buying agent.

On cross-examination of this witness, it was brought out that, although the merchandise could have been purchased without the services of Swedish Trading, it never was; that, in addition to the 4½ per centum commission paid by plaintiff, Swedish Trading received a ½ per centum "workmen's tool compensation" or discount from the manufacturer which, in effect, was ultimately passed on to the plaintiff, since the normal buying agency commission was 5 per centum but plaintiff paid Swedish Trading only 4½ per centum; that although in the back-to-back contracts Swedish Training is referred to as "seller" and plaintiff as "buyer," purchases were in fact made by plaintiff directly from the manufacturer. Swedish Trading never negotiated with the foreign manufacturer without the presence of plaintiff's representative, except in the case of a reorder where the standards were the same as the initial order.

Mr. Sutton specifically stated that he knew one of the brothers who owns the Chung Kai Knitting Co.; and that since that gentleman speaks a little English he, Mr. Sutton, had conducted a part of the negotiations for the purchase of its merchandise directly with him, the remainder of the terms being discussed by a representative of Swedish Trading.

In general, the testimony of Mr. Sutton was corroborated by statements contained in the two affidavits executed by the managing di-

rector of Swedish Trading, as well as by the summary of an interview with two officials of that company, conducted by Mr. Griffin.

Seemingly, however, the treasury agent's report of his interviews with representatives of the several foreign manufacturers tends to present a contrary picture. He indicates that these manufacturers advised him that they never offered or sold merchandise directly to United States importers; that prices were arrived at through negotiations and bargaining with Swedish Trading only; that Swedish Trading received a ½ per centum discount from each of the manufacturers; that they considered Swedish Trading, not Lollytogs, as the purchaser; and, in the case of the Chung Kai Knitting Factory, that they never see the United States customers or any of their representatives. Nevertheless, it does appear that each of the manufacturers clearly understood that the merchandise allegedly purchased by Swedish Trading was ultimately destined for Lollytogs; and all uniformly agreed that any claims for defective merchandise were properly addressed to them.

Insofar as this conflict of fact is concerned, it must be borne in mind that the manufacturers' descriptions of the relationships of the various parties, their respective capacities as seller, purchaser, and the like, are but the lay opinions of persons not qualified to define the legal status of the respective parties. Moreover, the treasury agent's report is at best a summary of conversations reputed to have been held with these people, whose direct observations are not available for the court's consideration. The matter is presented in the form of an unverified statement which clearly in not entitled to as much weight as the positive sworn testimony of the witness. *W. Stuart Smith* v. *United States*, 23 Cust. Ct. 20, C.D. 1182; *United States* v. *Supreme Merchandise Company*, 48 Cust. Ct. 714, A.R.D. 145. It seems pertinent further to observe that the testimony of the witness Sutton sets forth more than his conclusions concerning the relationship between his company and Swedish Trading. It is a detailed description of the services rendered by Swedish Trading and the respective roles played by that firm and his own in the conduct of negotiations leading to the eventual purchase of the merchandise here involved, from which the court is able to determine the status of the parties.

Whether or not a buying commission is *bona fide* depends upon the facts in each case, *Haddad & Sons, Inc.* v. *United States*, 53 Cust. Ct. 423, Reap. Dec. 10825. That a *bona fide* principal-agent relationship existed between these two companies and that Swedish Trading never was an independent purchaser is the clear purport of the testimony. It is also reasonably deducible from other evidence of record. The fact that Swedish Trading assumed no liability for damage or loss to the merchandise, whereas the manufacturers in each instance ac-

knowledged that responsibility, is strongly indicative of an agency relationship. In the normal course of events, it is the seller of merchandise, not a mere agent, who is expected to stand behind his product when claims are made for defects in production or shipment. Furthermore, not only do the contracts with the manufacturers recite that purchases are made for the account of Lollytogs, Ltd., of New York, but the contract with the manufacturer was not negotiated until terms were set by Lollytogs. The absolute identity of those terms in the reciprocal contracts with the manufacturers in the so-called back-to-back arrangements makes it apparent that Swedish Trading was acting in the capacity of an agent in the transactions between plaintiff and the foreign manufacturers.

It has long been settled law that a *bona fide* buying commission, one which inures to the benefit of the purchaser, not the seller, is no part of the value of imported merchandise. *Stein* v. *United States*, 1 Ct. Cust. Appls. 36, T.D. 31007; *United States* v. *Case & Co., Inc.*, 13 Ct. Cust. Appls. 122, T.D. 40958; *United States* v. *Dan Brechner et al.*, 38 Cust. Ct. 719, A.R.D. 71.

It is also well settled that an appealing party may challenge any one or more of the elements entering into an appraisement, while relying upon the statutory presumption of correctness of the appraiser's return as to the undisputed elements, whenever the challenged items do not destroy the balance of the appraisement. *United States* v. *Fritzsche Bros., Inc.*, 35 CCPA 60, C.A.D. 371; *United States* v. *Dan Brechner et al., supra; United States* v. *Gitkin Co.*, 46 Cust. Ct. 788, A.R.D. 132.

An appraisement such as is involved in the instant case at the invoice unit prices, plus one or more additional items, has been uniformly regarded as one susceptible of the application of the rule in the *Fritzsche* case, for it may be presumed that, in accepting the *per se* invoice prices, the appraiser found them to conform in all respects with the statutory definition of the basis of value he invoked in making his return. Such an appraisement is deemed a separable appraisement, subject to partial attack without the necessity of establishing any of the elements not in dispute. *United States* v. *Dan Brechner et al., supra; United States* v. *Supreme Merchandise Company, supra.*

As the writer of this opinion recently stated, in the case of *Haddad & Sons, Inc.* v. *United States*, 54 Cust. Ct. 600, Reap. Dec. 10942:

* * * where the appraisement is stated in terms of a first cost or ex-factory price, plus the disputed charges, the appraisement is considered to be separable, and the party challenging the appraiser's return may rely upon the presumption of correctness as to all elements of the appraisement which he does not seek to dispute. Thus, such an appraisement may be attacked simply by negativing the charges without affirmatively establishing that the ex-factory price is a price which accords with every element entering into the statutory definition of export value. * * *

Counsel for the Government argues, however, that the presumption of correctness of the appraiser's return is rebuttable, and, in this case, has been rebutted by evidence that the merchandise was not freely sold or offered for sale at the invoice f.o.b. unit prices, but was, in fact, sold and offered for sale at the f.o.b. unit prices, less a ½ per centum discount to Swedish Trading.

While there might be some merit to this contention, if it were established that Swedish Trading was, in fact, the purchaser, it is entitled to little consideration under the circumstances which surround the present transactions. The weight of the evidence supports the conclusion that Lollytogs, Ltd., not Swedish Trading, was the purchaser of the merchandise in issue and that the prices it paid were the invoice unit prices. The ½ per centum discount was not an element in the transaction between the manufacturers and the ultimate purchaser, and there is no need to consider the price received by the seller. The statute is directed to the price at which the merchandise is sold or offered for sale, and the portion of the price which is credited to the seller is of no moment. *United States* v. *Zellerbach Paper Co.* (*Hoyt, Shepston & Sciaroni*), 28 CCPA 303, C.A.D. 159.

It seems questionable in any event that the instant record could be interpreted as containing evidence to rebut the presumption of correctness of the invoice unit values. Plaintiff did not assume to challenge the appraiser's action in this respect. It did not urge lesser unit values than those found by the appraiser, but accepted and relied thereon, and addressed its proof to the single question of whether the 4½ per centum commission, an item clearly separate from the remainder of the appraisement, was or was not, a part of the value of the merchandise.

In view of the conclusion heretofore reached that the 4½ per centum item added by the appraiser reflected a *bona fide* purchasing commission paid to an agent who acted on behalf of the plaintiff in connection with its purchases of the merchandise here involved, it follows that such commission was not a part of the export value of such merchandise. The court, therefore, makes the following findings of fact:

1. The merchandise covered by the instant appeals for reappraisement consists of children's clothing, entered at invoiced unit prices, f.o.b. Hong Kong.

2. Said merchandise was appraised at the invoice unit values, plus 4½ per centum, on the basis of export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

3. During the period covered by the transactions leading to the purchase of the merchandise at bar, plaintiff employed The Swedish

Trading Co., Ltd., of Hong Kong, as its agent to assist in said purchases and to perform other services in connection with the shipment of said merchandise to the United States and payment therefor.

4. For said services, plaintiff agreed to pay a commission of 4½ per centum of the total invoice values.

5. At all times pertinent hereto, plaintiff could have purchased such or similar merchandise directly from the manufacturers, without the payment of said commission.

The court, therefore, concludes that:

1. The 4½ per centum item paid by plaintiff to The Swedish Trading Co., Ltd., was a *bona fide* buying commission which formed no part of the value of the merchandise covered by the instant consolidated appeals for reappraisement.

2. Export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the merchandise covered by said appeals for reappraisement.

3. Such values are the invoice unit values, f.o.b. Hong Kong, exclusive of any additional charges or commissions.

Judgment will be entered accordingly.