(R.D. 11359)

ROBERT E. LANDWEER & CO., INC., a/c ROBERT NEWTON & SONS, INC., ET AL. *v.* UNITED STATES

(Decided September 12, 1967)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiffs.
*Carl Eardley*, Acting Assistant Attorney General (*Mollie Strum*, trial attorney), for the defendant.

WILSON, Judge: The imported merchandise in the two consolidated reappraisement appeals herein is invoiced as follows:

First, in R66/16587, the boat involved was "One (1) 36 foot Power Cruiser complete with engines." The invoice price which is also the claimed and entered price in this appeal is U.S. $14,900, f.o.b., with freight and insurance payable at destination. The appraised value, on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165, is $20,015, net packed. This boat is referred to as a Grand Banks 36 power cruiser, hull No. 5, being the fifth boat of that model (R. 27).

Second, in R66/16588, the boat involved was invoiced and entered as "One 35′ Magallain Class Motorsailer designed by Eldridge McGinnis, including life lines, pulpit, main sail & #2 Jib." The invoice, claimed and entered price is U.S. $14,850, f.o.b., with freight and insurance payable at destination. The appraised value on the basis of export value, *supra*, is $17,992, net packed. This boat is referred to as a Magellan 35 motorsailer, being hull No. 12 (R. 37).

The above described boats, so-called "stock boats," were manufactured and allegedly sold by American Marine, Ltd., hereinafter also referred to as Amer. Mar. of Hong Kong, to Robert Newton & Sons, Inc., hereinafter also referred to as the Newton Corp. of Costa Mesa, California. Shipments were made directly to Salmon Bay Marina of Seattle, Washington, at which port both entries were made. The power cruiser in R66/16587 was exported from Hong Kong on August 29 or 30, 1964, and entered on September 28, 1964. The motorsailer in R66/16588 was exported on or about July 27, 1965, and entered on August 13, 1965. Both boats were appraised on February 9, 1966.

A customs broker, Robert E. Landweer & Co., Inc., of Seattle, made the entry in R66/16587 for the account of Robert Newton & Sons, Inc. The "Declaration of Owner" is dated October 16, 1964, and is signed "Robert Newton [X] *Member of firm*, Costa Mesa, California," representing Robert Newton & Sons, Inc., of Costa Mesa, California. Robert Newton testified that the power cruiser in this entry was purchased by Robert Newton & Sons, Inc., from American Marine, Ltd., for $14,900 and that title was transferred to Salmon Bay Marina "on the high seas" for $20,015 (R. 69–70). The witness later said he *assumed* title passed after entry (R. 104). Another witness, Thomas C. Carney said he *assumed* title passed after importation. His testimony was not based upon records or upon his own recollections but upon mere assumption. The entered value in this case includes $950 for various items of the ship's equipment stated to be American goods returned. However, plaintiffs make no claim for said items. It will, therefore, not be further considered herein.

In R66/16588 entry was made by Salmon Bay Marina, % Robert E. Landweer & Co., Inc., at $14,850. The court file, in evidence without being marked, contains a certificate by the broker alleging that the 35 foot motorsailer was "sold to Howard H. Cole and thence to Howard H. Cole dba Salmon Bay Marina, per invoice attached while in transit to the United States." The invoice referred to is dated August 3, 1965, and bears No. 83651. It discloses a sale of said boat for U.S. $17,992 by "Robert Newton & Sons, Inc. by T. C. Carney" to Howard H. Cole, Seattle, Washington.

The following portions of subsections of section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165, are relevant herein:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or
(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions * * *.

(2)   The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3)   The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

Section 2633 of title 28, U.S. Code, provides in pertinent part:

The value found by the appraiser shall be presumed to be the value of the merchandise. The burden shall rest upon the party who challenges its correctness to prove otherwise.

At the trial, plaintiffs offered the oral testimony of two witnesses (174 pages of testimony), and introduced seven documentary exhibits, 1 to 7, of which exhibit 3, an alleged costing record for the Magellan 35 boat (R. 38, 39, 46), was marked only for identification. The defendant introduced certain documents, exhibits A to E, of which collective exhibit D consists of more than 1,000 check stubs and paid checks of Robert Newton & Sons, Inc., as well as a financial statement of that firm as of December 31, 1964, prepared by John T. Castle Company, accountant and auditor, produced by plaintiffs pursuant to the service of a subpoena *duces tecum*. The official court papers in both cases were received in evidence without being marked. The evidence so far as deemed necessary will be referred to hereinafter.

Plaintiffs' first witness, Robert Newton, testified that he has been the managing director of Amer. Mar. since 1957 when it was organized and that he and his two sons, John and Whitney (R. 143), own 83 percent of the stock. He also stated that no officer or director of the Newton Corp. owns stock in Amer. Mar. (R. 12). However, he testified that up to about August 29, 1964, he was treasurer of the Newton Corp. (R. 49). He further testified that Amer. Mar. is one of the largest boat building firms in the world and the largest in Hong Kong where there are "a lot of small Chinese yards, but there are only 3 yards that are building for some export" (R. 15). The largest of those three yards sells fiberglass boats, while the other two do not build fiberglass but sell "mostly custom individual jobs, and they run from lightweight power boats to possibly heavy motorsailers" (R. 16). He further testified that he has been directly in charge of the operation of the business of Amer. Mar. since the company was organized and that his son Whitney who is in Hong Kong is under him. Robert Newton came to the United States from Hong Kong in 1963 and there is no

evidence that he returned to Hong Kong. Accordingly, Whitney Newton was in direct charge in Hong Kong during the period here involved.

Robert Newton also testified that in 1963 when he came to the United States from Hong Kong he requested an attorney to form a corporation "to which we lent our name [Robert Newton & Sons, Inc.] and then set out to find somebody that I thought was qualified and that we would want to deal with to take over this corporation and act as a representative for Americans" (R. 19, 20). The Newton Corp. application for incorporation was filed in Los Angeles, California, on February 14, 1964 (exhibit A). Newton testified that, about the middle of 1964, one Thomas C. Carney took over the ownership and operation of the Newton Corp. (R. 20).

Plaintiffs' exhibit 1, identified by Newton, is a letter dated April 7, 1964, showing "Robert Newton & Sons, Inc., Costa Mesa, California," at the top thereof. It is addressed to American Marine, Ltd., Kowloon Box 6649, Hong Kong, B.C.C., and states in part: "I am to be sole representative for American Marine Ltd. for Magellan 35 and the Grand Banks 36. * * * I will buy these boats at your offered prices and will sell them to the dealers at the prices you recommend. * * * this agreement may be cancelled by either party on six months written notice. Please sign and return the copy." The letter is signed "Thomas C. Carney, Jr." and also "Robert Newton, American Marine Ltd." It will be observed that the agreement is *not* signed by Robert Newton & Sons, Inc., but by Carney personally.

Newton stated that, when he set up the Newton Corp., he owned no stock therein; that he never had any financial interest in its profits; that he is not related in any way nor is any officer, director, or stockholder of Amer. Mar. related either by marriage or by blood to any officer, director, or stockholder of Newton Corp., and that he never received any income out of the profits of Newton Corp. (R. 24, 25). As will appear later, these statements are inconsistent with actual practices of the Newtons and their corporation. He said that he did a great deal to help Carney after he took over active management in running the Newton Corp. by calling on dealers, traveling all over the United States, and supervised or assisted him in the operation, "because it was our prime interest as to what he did," referring to Amer. Mar. in the use of the word "our." He alleged that he received no income out of the profits of the Newton Corp. and that neither he nor Amer. Mar. received any money for his work for the Newton Corp. (R. 25, 26). Again the record does not bear out this claim except as to the traveling and supervision statements.

Newton stated that the Newton Corp. received their working capital from Amer. Mar. and in 1964 there were times when it amounted to

$40,000 to $50,000 and varied as part was paid back when income came in. He said that Amer. Mar. did not share in fees charged by the Newton Corp. when they sold boats purchased from them (R. 26, 27).

Plaintiffs' illustrative exhibit 2, which Newton identified, is a photograph depicting a Grand Banks 36 power cruiser which is a duplicate of hull No. 5 in R66/16587 and contains the same plans and specifications, though the paint colors may vary (R. 28).

Mr. Newton stated that he made a trip to Seattle to check the Grand Banks boat in R66/16587 when it arrived at that port. He signed the owner's declaration dated October 16, 1964, at Carney's authorization "in order to save Mr. Carney going up there" (R. 29). That document indicates that he signed as a representative for Robert Newton & Sons, Inc., by signing "Robert Newton [X] *Member of firm*, Costa Mesa, California." He did not indicate whether he was an officer or held a power of attorney so to do. He testified that the first six Grand Banks were sold for $14,900 each for export to the United States, which was the price established at the time Amer. Mar. commenced to build them for sale. Since then, the price has been raised twice because of increased costs and insufficient profit (R. 30, 36). The cost of hull No. 6, he said, was $14,298 (R. 37).

Mr. Newton testified that the M35–12 boat in R66/16588 is a stock boat and that a print from a brochure on file herein depicts the Magellan 35. The print states in part: "Built By: American Marine Ltd. Owned and operated by Robert Newton & Sons, Kowloon, P.O. Box 6649, Hong Kong, B.C.C.," and "West Coast U.S. Office: 1651 Placentia Ave., Suite N, Costa Mesa, Calif." This is the same address stated on Newton Corp. checks in the Hong Kong and Shanghai Banking Corp. The price shown in the print is $24,950. Mr. Newton stated that Robert Newton & Sons, Kowloon, are not the same as Robert Newton & Sons, Inc., the former consisting of Robert Newton and his two sons, John and Whitney, who together owned 83 percent of American Marine, Ltd., while the latter is a separate and different corporation (R. 37, 38, 58). He testified that, at the time of trial, in August 1966 he was not dealing with the Newton Corp. "Because Mr. Carney was unable—the sale of his business was not transacted, or not concluded, and he had to go back and take it over, and it was deemed apparent that it was not going to be possible for him to come back within a reasonable length of time to take this operation over, and so that company has been closed" (R. 42). It would seem to be a fair deduction that Newton let the corporation die. There is no evidence that Carney ever invested a dollar in the Newton company or that he ever really managed the company. He was a mere pawn or tool for Robert Newton.

Under cross-examination, Newton testified that the Newton Corp. was organized to be the *sales representative* only for Amer. Mar.

(R. 43). The application for incorporation is dated February 14, 1964 (exhibit A), and indicates that Lana Jordan, who was an employee of the attorneys that prepared those papers, was to receive 100 shares of the corporation stock (all issued shares, R. 56) ; that Robert W. Peinado was designated as president, he being an attorney in the office of the same attorneys (R. 48). There is no evidence whatever that either Lana Jordan or Peinado ever paid anything into the corporation or paid any consideration for the stock. At the time of exportation of the boat in R66/16587 on or about August 29, 1964, Robert Newton was treasurer of the Newton Corp. and also president and one of the owners of Amer. Mar. (R. 49). He said that Miss Jordan's stock was turned over to Mr. Carney on September 8, 1964 (R. 49). Although he testified he does not consider himself a "member of the firm." of the Newton Corp., he nevertheless signed the owner's declaration on October 16, 1964, as a "Member of firm" of Robert Newton & Sons, Inc. He said he did so by Carney's written authorization, alleging "I think power of attorney * * * to act in Mr. Carney's behalf from time to time * * *" (R. 50). The record does not contain a power of attorney to act for Mr. Carney or to act for the Newton Corp.

Robert Newton testified that he used the Newton Corp. office after it entered into a lease about August 1, 1964, and continued to do so after Carney acquired the corporation stock (R. 53). He stated that Carney drew no salary in 1964 but was a paid a *salary* of $200 a month *plus a bonus* of $50 each month commencing in January 1965 (R. 54). Newton stated that he received no compensation for being at the corporation but did receive "traveling expenses" (R. 52, 54).

Newton also testified that several Newton Corp. checks were made out to John Newton, his son and part owner of Amer. Mar., which represent money furnished by and belonging to Amer. Mar., that he, Robert Newton, said was part of $25,000 or $30,000 furnished by Amer. Mar. as a loan to the Newton Corp. to start the business which was being gradually paid back (R. 61, 62). He managed the Newton Corp. until Mr. Carney got into it (R. 62). Carney testified that his power of attorney to Newton authorized him "to sign checks, manage the office, make loans and transact all the business of that corporation" (R. 124). This is a fantastic assertion in view of other facts in the record.

Mr. Newton further testified that the Grand Banks No. 5 in R66/16587 was purchased by Robert Newton & Sons, Inc., from American Marine, Ltd., of Hong Kong for $14,900 and was sold for $20,015 and shipped directly to Salmon Bay Marina, Seattle, title passing on the high seas (R. 69, 70). He stated that the 35 foot Magellan in R66/16588 was billed at $14,850 and sold to Salmon Bay Marina for $17,992 (R. 71). A Grand Banks 36 was sold to Eugene R. Ritchie of Honolulu directly by Amer. Mar. (R. 71). The invoice therefor, exhibit B, is dated June 17, 1964, and the price is $14,900, plus freight Hong Kong

to Honolulu of $1,292 for a total of $16,192. A Grand Banks 36, hull No. 7 (exhibit C) was invoiced November 11, 1964, by the Newton Corp. to Philip Lelienthal of San Francisco, who is the financial partner behind Thorstand Yachts, at $20,860 (R. 73, 74). Newton stated "To that company the boat prices to them, I think, varied some, because there had been some price changes. I couldn't tell" (R. 73). Lelienthal ordered direct from Amer. Mar. (R. 75).

Newton also testified that, in August 1965, Carney was the sole stockholder of the Newton Corp.; that he (Newton) had written and signed the letter dated August 19, 1965, on the American Marine, Ltd., Kowloon stationery which he had here, to Mr. Howard Cole of Salmon Bay Marina, Seattle (R. 76, 77). The letter is part of the official file in R66/16588 and refers to a charge of $250 paid by Amer. Mar. to Eldridge McGinnis who designed the M–35, and that said amount is part of the cost of the boat.

He also stated that Amer. Mar. loaned varying amounts at many different times to the Newton Corp. which, *he assumed*, were deposited in a bank. Asked whether the books reflect that liability, he said (R. 80): "I would think they would" and "I hope, yes, they would certainly show American Marine's business." He said that he did not supervise the keeping of their books at that time. In answer to the court's question whether books other than a check book for 1964 and stubs produced under subpoena (collective exhibit D, R. 158) were kept, Newton stated:

THE WITNESS: Any books, in addition to that, would be in Mr. Castle's file.

Let me add this, the nature of that business was such that the bookkeeping was, unfortunately, considered not a very important feature, because it was a simple operation, and the method of doing it was simply vouchers and keeping check books, record vouchers in folders, and at the end of the year we gave it to the auditor, and he made up the books. [R. 81.]

The statement referred to is part of collective exhibit D but no *books* were produced or offered in evidence by plaintiffs.

Newton testified that certain stubs for 1964 which disclosed payments to himself, to his sons, to doctors for medical bills, to the city for traffic violations, to utilities for personal expenses, and to other members of his family were not some form of compensation but that the Newton Corp. checking account was used for payment of these bills; that they were repaid in the form of travel vouchers for travel expenses; that the excess amount received over such expense was charged to him, or to Amer. Mar. and "is not an out-of-pocket expense of this company—of Robert Newton [& Sons, Inc.]" (R. 84, 85, 91). He alleged that he and his sons personally, aside from Amer. Mar., loaned money to the Newton Corp. by check (R. 85). No documentary

evidence to support that assertion has been called to the court's attention, and the financial statement, part of collective exhibit D, does not disclose any such alleged outstanding loans. The financial statement of December 31, 1964, does reflect an account receivable from Robert Newton to the Newton Corp. of $3,794.07 but this it not further satisfactorily explained. Mr. Newton said that such financial statement would show what Amer. Mar. had actually advanced (R. 87), but no statement is in fact shown.

A large number of checks and check stubs of the Robert Newton Corp. (part of defendant's collective exhibit D) indicate that the Newtons, particularly Robert, controlled completely the bank accounts of the Robert Newton Corp. and used the funds of that corporation for their personal expenses and for the benefit of other corporations they controlled. See following numbered stubs: 144, 167, 168, 195, 196, 199, 250, 326, 367, and 406.

When Robert Newton was asked why the Newton company's financial statement of December 31, 1964, part of collective exhibit D, did not reflect an alleged liability to Amer. Mar., he answered (R. 94) :

I can't answer that, excepting by the fact that it did reflect the income due from American Marine, which I believe is part of the method of keeping cash books. But I am not a qualified accountant.

That statement does show "accounts receivable—American Marine Ltd.—$3794.07" which is not further explained.

An examination of the several hundred checks of the Newton Corp. for 1964 and 1965 indicates they were indiscriminately signed either by Carney or Newton. None of the checks indicated the relationship or the capacity of the signer. The checks merely bore the name of the signer on a Robert Newton & Sons, Inc., printed check showing that name only at the top of each check.

Newton testified that since January 1, 1966, Amer. Mar. boats were sold direct by that firm to dealers in the United States and the cost of operating here has been paid by Amer. Mar. (R. 94) as Robert Newton & Sons, Inc., is a defunct corporation and was no longer active in the business since then (R. 95).

Thomas C. Carney, called as a witness for plaintiffs, added little evidence of value. His statement that he bought all of the stock of the Robert Newton Corp. from Lana Jordan is not worthy of any weight. He had never been in the boat business and knew nothing concerning the operation of such an enterprise. There is no testimony of how much he paid Lana Jordan for the company stock or how he paid the claimed purchase price. He could make no satisfactory explanation concerning the alleged power of attorney given to Robert Newton and did not produce either the original or a copy of such an alleged document. Yet he testified that while he, Carney, was connected with Robert

Newton and Sons company, Robert Newton personally had full authority under a power of attorney "to sign checks, manage the office, make loans and transact all the business of that corporation." Yet there is nothing in the record to indicate that the directors of the corporation ever authorized Carney to relinquish all the managerial affairs of the corporation to an alleged stranger. Thus the whole situation is incredible.

The defendant introduced exhibits A and B and collective exhibits C, D, and E. Collective exhibit E consists of a report, "HK 3–212," made by the Acting Senior Customs Representative at Hong Kong dated March 29, 1965, together with attached subexhibits "A" through "H." This collective exhibit E also contains a further report "HK 3–212," made by the same representative at Hong Kong dated October 21, 1965. An additional report by the same representative bearing the same identification marks is dated December 6, 1965, at Hong Kong. Collective exhibit E also contains a report by James L. Light, Customs Agent, dated January 27, 1966, file S8–1316 made at Seattle, Washington. All of those reports were made *prior* to appraisement on February 9, 1966. Customs Agent Light also made a further report on March 10, 1966, and attached certain documents. This collective exhibit E will be referred to *infra* as deemed appropriate.

The contentions of the respective parties are discerned from the record:

JUDGE WILSON: In this case, as I see it the Government is contending the real value of these boats is indicated by the price at which they were sold to the ultimate user in the United States, and that the Robert Newton Company was merely set up for the purpose of enabling them to claim a different value, and they were not an independent entity.

The plaintiff is claiming that the Robert Newton Company is an independent entity, and that the true appraised value was that value at which they were sold to Robert Newton & Co. * * *. [R. 162–163.]

Government counsel stated (R. 21) that it considered the transaction between Amer. Mar. and Newton Corp. "one between related persons." In this connection the record discloses a most extraordinary and unusually close affinity in the course of business conduct between Robert Newton and those two firms, prior to Carney's becoming president of Newton Corp., during his alleged connection therewith and thereafter.

Counsel for plaintiffs, brief page 14, argues that the evidence shows that Amer. Mar. "is the only boatbuilder in Hong Kong building stock boats with wooden hulls for exportation to the United States." However, Mr. Newton testified that he could *not* state the exact number of *other* wood boatbuilders there were in Hong Kong; that there "are

only 3 yards that are building for some export"; that the largest of the three was building fiberglass sail boats principally; that the other two builders' "boats run by the nature of their selling setup, their boats are *mostly* custom individual jobs, and they run from lightweight power boats to possibly heavy motorsailers" [emphasis supplied] (R. 15, 16). The evidence is, therefore, not clear as to whether the "custom individual jobs" and the other boats sold by said two builders are or are not such or similar to Amer. Mar. "stock boats" or are the same class or kind. These possibilities do not appear to have been satisfactorily or successfully negatived. Such evidence is necessary to meet the statute requirements for "ordinary course of trade" relating to "conditions and practices which * * * have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement." (Section 402(f) (2) *supra.*) See *Chr. Bjelland & Co., Inc.* v. *United States*, 45 Cust. Ct. 435, Reap. Dec. 9753, construing "ordinary course of trade." *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841, authorizes consideration of *all sales* for export and for home consumption. There is no evidence here as to sales for export or for home consumption by other manufacturers of boats of the same class or kind as those involved herein.

Plaintiffs also assert that there should be no dispute concerning the ordinary course of trade, as Amer. Mar. sought from the beginning to sell to one selected wholesaler, citing *United States* v. *Acme Steel Company, supra*, and *Chr. Bjelland & Co., Inc.* v. *United States*, 52 CCPA 38, C.A.D. 855. The dispute herein, however, is whether the course of business conducted between Amer. Mar., Robert Newton, and Newton Corp. is in the ordinary course of trade, also whether Newton Corp. was in fact a *bona fide* selected purchaser under the prevailing conditions shown of record or whether the facts herein are repugnant to a buyer-seller relationship and more compatible with a principal and agent relationship. Note *Dorf International, Inc., et al.* v. *United States*, 58 Cust. Ct. 634, R.D. 11278, motion for rehearing by plaintiffs denied June 28, 1967.

The plaintiffs further contend that "The only question in dispute is whether the above prices [$14,900 for the Grand Banks 36 in R66/16587 and $14,850 for the Magellan 35 in R66/16588] fairly reflect market value." In view of the fact that there were *other* wood boatbuilders in Hong Kong, it may *not* be proper to exclude them in ascertaining the ordinary course of trade in the absence of evidence of the business practices of the other boatbuilders and thereby rely *solely* on the course of business conduct as exemplified by Amer. Mar.

Plaintiff's contention that whether the entered prices fairly reflect market value turns on the question of fact upon which there is some conflict in the evidence. While there is some oral evidence that Amer.

Mar. did not share in any of the "profits" realized by the Newton Corp. and that the Newtons received no salary or compensation from Newton Corp., the documentary evidence shows innumerable payments by check to either Amer. Mar., Robert Newton, John Newton, Whitney Newton, or other Newton family members, for personal uses of one or the other. These payments were allegedly made for repayment of loans or for repayment of travel disbursements. Books to support these allegations were not offered by the plaintiffs, and the Newton Corp.'s financial statement of December 31, 1964, part of collective exhibit D, reflects no such *liability* to any of the named persons or to Amer. Mar. It does reflect an *asset* of an account receivable *from* Amer. Mar. of $3,794.07, but there is nothing of record to show how that figure was arrived at.

To support the contention that the sworn oral testimony of plaintiffs' witnesses is entitled to greater credibility than the customs agents' reports, collective exhibit E, plaintiffs cite the case of *Lollytogs, Ltd.* v. *United States*, 55 Cust. Ct. 608, Reap. Dec. 11073. In that case, the court stated at page 612 that a Treasury agent's report was "at best a summary of conversations reputed to have been held with these people, whose direct observations are not available for the court's consideration. The matter is presented in the form of an unverified statement which clearly in [sic] not entitled to as much weight as the positive sworn testimony of the witness. *W. Stuart Smith* v. *United States*, 23 Cust. Ct. 20, C.D. 1182; *United States* v. *Supreme Merchandise Company*, 48 Cust. Ct. 714, A.R.D. 145."

The *Lollytogs, Ltd.*, case, *supra*, involved the question of a *bona fide* buying commission erroneously included in the appraised value. It appears that the agent of the American purchaser performed certain services abroad on behalf of the importer and performed no services for the manufacturer. In that case, the Treasury agent interviewed representatives of several *other* foreign manufacturers who advised him they never offered or sold merchandise directly to United States importers; that prices were arrived at through negotiations and bargaining. These statements were all in conflict with facts stated in sworn testimony.

In the instant case, the reports, except the one dated March 10, 1966, were made *prior* to the date of appraisement on February 9, 1966. They relate to interviews with Whitney Gill Newton, a *substantial stockholder in and local Hong Kong general manager* of Amer. Mar. Robert Newton was managing director (R. 12) and allegedly directly in charge of the operation of the business of Amer. Mar. though he was then in the United States, while his son, Whitney, who was in Hong Kong, was next under him in the direction of the business of Amer. Mar. (R. 16). The reports in the case at bar do *not* relate to inter-

views with *strangers* to the involved transactions as were the interviews in *Lollytogs, Ltd., supra.* Here, Whitney Gill Newton to whom certain checks of the Newton Corp. were sent gave information *prior to appraisement and litigation* to the customs agent *while a factual investigation was being conducted to enable customs officers to properly appraise merchandise which Amer. Mar. had shipped to the United States.*

The Hong Kong report dated March 29, 1965, in defendant's exhibit E, contains the following statements:

Page 2:

* * * Mr. Newton stated that most of the sales are made through Newton & Sons, Inc., but shipments by American Marine are made directly to the ultimate purchasers, having placed the original orders with the Costa Mesa firm. American Marine receives payments from Robert Newton & Sons, Inc., who in turn receives payments, usually 25 percent higher, from the ultimate consignee, who, by the way, pays duty based on the original American Marine's invoice price. .

Mr. Newton further stated that Robert Newton & Sons, Inc. acts as the selling agent for American Marine, and is primarily responsible for promoting through advertising the sales of boats built by American Marine; receiving orders and representing American Marine in the United States. As it was mentioned above, Robert Newton & Sons Inc., in return for such services, earns approximately 25 percent profit (mark-up) added extra.

According to Mr. Newton, Robert Newton & Sons Inc. is managed by his father, Mr. Robert J. Newton, a major share-holder of American Marine Ltd., and is owned essentially by the same persons as American Marine Ltd. * * *

Page 3:

Mr. Newton further stated that the prices charged for items ordered directly, and not through Robert Newton & Sons Inc., are usually 20 to 25 percent higher than those charged to Robert Newton & Sons Inc.

\* \* \* \* \* \* \*

It was noted that most boats have been invoiced just barely under US $15,000.00 each, thus subject to duty at 4% rather than 10% which is the applicable rate for yachts valued at over US $15,000.00 each.

\* \* \* \* \* \* \*

Page 5:

However, as Mr. Newton stated, additional profit is realized by American Marine indirectly through the profit made by their selling agent in the United States, Robert Newton & Sons Inc. Mr. Newton further admitted that similar boats would be sold to customers not placing orders through Robert Newton & Sons Inc. at prices about 20 to 25 percent higher.

The Hong Kong report dated October 21, 1965, contains the following statements:

Page 1:

On October 20, 1965, I interviewed Mr. Whitney Gill Newton, partner and general manager, American Marine Ltd., Hong Kong (same person was interviewed previously, as reported in our report dated March 29, 1965, but the name was shown as John R. Newton, Jr., in error) and the following information was obtained.

1. Robert Newton and Sons Inc., of Costa Mesa was formed personally by Robert Newton, Sr., to be the exclusive selling agent of American Marine Ltd. in the United States. Originally, all the outstanding shares were held by Miss Lana Jordan, a secretary for Robert Newton, Sr. In September 8, 1964, the shares of stock were transferred to the name of T. C. Carney.

\*        \*        \*        \*        \*        \*        \*

Pages 1 and 2:

3. Whitney Gill Newton said that although Carney owns 100 percent of the outstanding shares of Robert Newton and Sons Company, the majority of the profit realized in the United States goes to the Newtons. The method for accomplishing this, according to Whitney Gill Newton, is by having the Newtons draw substantial amounts of money from Robert Newton and Sons Inc. as salaries and/or sales commissions so that there is no profit ever shown for the shareholder, T. C. Carney.

4. Mr. Newton stated to me again that the same merchandise would definitely not be sold directly to any purchasers at the same unit values if such sales were not handled through his father in Costa Mesa. Our constructed value information (HK 3–212, dated March 29, 1965) indicates that American Marine Ltd. realizes a rather insignificant amount of profit, based on the "selling price" as shown on the invoices issued to Robert Newton and Son, Inc., and that additional profit was made in the United States.

The Seattle report dated January 27, 1966 (part of exhibit E), indicates that the customs agent interviewed Howard H. Cole, sole owner of American Marine sales and leasor of the Salmon Bay Marina, who gave information verified by the firm's records, and that of Robert E. Landweer & Co., that Cole paid $20,015, plus certain freight, insurance, and duty, with reference to "C.E. 13698, 9/28/64" which refers to the boat in R66/16587. He also paid $17,992 and other charges with reference to "C.E. 12015, 8/13/65" which refers to the boat in R66/16588.

In *Florea & Co., Inc.* v. *United States*, 11 Cust. Ct. 377, 383, Reap. Dec. 5907, the court stated that there can be no doubt that Congress

intended, in its enactment of section 501 of the Tariff Act of 1930, reading:

In finding such value [dutiable value] affidavits and depositions of persons *whose attendance can not reasonably be had,* price lists and catalogues, reports or depositions of consuls, customs agents, collectors, appraisers, assistant appraisers, examiners, and other officers of the Government may be admitted in evidence. [Italics quoted.] [Now included in title 28, section 2633, U.S. Code.]

to permit the receipt in evidence of customs agents' reports; that of necessity the Government must resort to investigations, in most instances far from the port of entry; that experienced and reliable Government agents designated for the purpose cannot be available at all times when cases are before the court, that—

* * * The language of the statute is plain and unambiguous, expressing a legislative intent that relaxes the hearsay rule and permits such reports to be admitted in this class of cases. And the acceptance of such reports for their evidentiary value applies with equal propriety even though the author, for obvious and sound reasons, is not present at the trial. The conclusion on this proposition is in harmony with views of this court set forth in *Luigi Vitelli Elvea, Inc.* v. *United States,* Reap. Dec. 5661.

In *Heller Deltah Co., Inc., Perlas Import Corp., D. Lisner & Co., Inc.* v. *United States,* 39 CCPA 101, C.A.D. 471, affirming the decision of the Second Division, Appellate Term, United States Customs Court, 24 Cust. Ct. 595, Reap. Dec. 7819, which had affirmed the trial court in 22 Cust. Ct. 428, Reap. Dec. 7689, the court quoted from a Treasury representative's report *in extenso,* and stated, page 107:

The credibility of witnesses, the weight to be attached to affidavits, and the reports of government agents and exhibits, is entirely within the province of the lower tribunals. * * * However, in this case, it is our opinion that the evidence objected to by counsel for appellants is properly sanctioned by statute. A careful examination of the record, vital portions of which have been quoted herein, convinces us that there is substantial evidence to sustain the judgment of the Customs Court.

The record herein amply establishes that the invoiced, entered, and claimed values by plaintiffs are $14,900 and $14,850 respectively in R66/16587 and R66/16588 and that respectively the appraised values are $20,015 and $17,992.

This record does not depict an ordinary course of trade as defined in section 402 (f) (2), *supra,* between Amer. Mar., Newton Corp., Robert Newton, and Thomas C. Carney. After seeing and hearing the witnesses testify and giving close scrutiny to the oral and documentary evidence, and weighing the same, I find that the evidence discloses a situation which is incompatible, inconsistent, and irreconcilable with

a buyer and seller relationship between said parties. This is exemplified by numerous facts appearing in the record.

When the conduct of the Newtons and their corporations are considered together with the information given by Whitney Newton to government agents *prior* to appraisement and before litigation as contained in collective exhibit E, the reports are entitled to greater credence and weight than the testimony of Robert Newton and Thomas C. Carney given *after* appraisement and during litigation. To disregard the evidence contained in the reports, under the circumstances hereinabove indicated, would seriously undermine information obtained by reliable government agents designated for the purpose. (*Florea & Co. Inc.* v. *United States, supra, and Heller Deltah Co., Inc., et al.* v. *United States, supra.*)

In *International Forwarding Co., Inc., et al.* v. *United States*, 32 Cust. Ct. 577, Reap. Dec. 8281, consular invoices offered in evidence by plaintiffs contained statements material to the issue made by the exporter which are contradictory to the statements made subsequently by the same person in an affidavit also offered in evidence by plaintiffs. The court held that in the absence of explanation, plaintiffs were bound by the statements on the invoices. In the case at bar, the customs agent reported information obtained from Whitney Newton, manager of the exporter, prior to appraisement, as were the consular invoice statements in the above case; his statements were material for appraisement purposes as well as to the issue herein; those statements were contradictory, in part, to subsequent evidence introduced by Robert Newton, another representative of the exporter. In the absence of explanation, the information given by Whitney Newton to the customs agent is entitled to greater weight than the oral testimony in court.

In *Fine Arts Bag Co.* v. *United States*, 56 Cust. Ct. 597, 603, Reap. Dec. 11128, the court stated:

Plaintiff argues that sworn testimony, both oral and in affidavit form, should be given greater weight than the unsworn, largely hearsay statements of the Treasury reports. Courts have on occasion taken this view. (*Berben Corporation* v. *United States*, 45 Cust. Ct. 482, Reap. Dec. 9785, reversed on other grounds, 49 Cust. Ct. 497, A.R.D. 147.) However, Congress has seen fit to make such unsworn, hearsay-type reports admissible in evidence in all reappraisement cases (28 U.S.C., section 2633). Moreover, they have been likened to facts learned in the course of business or employment. *Cf. United States* v. *American Express Co.*, 44 Cust. Ct. 779, A.R.D. 120. While in some cases the content of a report, as well as other circumstances existing in a record, may cause a court to afford them little weight, the circumstances existing in this case, as well as the nature of the reports themselves, afford no such inclination. To give the reports no weight at all because unsworn and of a hearsay nature would frustrate the intent of Congress. To give them any weight, because of their relevant

and detailed accounts, produces diametrically opposed pictures of the Japanese export market for the involved merchandise. The record as a whole does not resolve the conflict and the court need not. It is sufficient to say that plaintiff's evidence has been effectively countered and its burden of proof not sustained. *Cf. The Heyman Co.* v. *United States*, 39 Cust. Ct. 707, Reap. Dec. 9033.

The foregoing principles should apply in the case at bar.

In *United States* v. *American Express Co.*, 44 Cust. Ct. 779, 784, A.R.D. 120, the court stated that testimony as to facts learned by a duly authorized Treasury agent in the course of his official investigation in connection with the value of imported merchandise is *not* incompetent though hearsay; that the knowledge acquired in the line of official duty "is somewhat analogous to that of an officer or employee testifying to facts learned in the course of employment," citing from *Transcontinental Petroleum Co.* v. *Interocean Oil Co.*, 262 F. 278.

Under the facts in this case, the court may pierce the thin corporate veil of the Newton Corp. and in doing so observe its real and genuine relationship to the several named Newtons and to Amer. Mar. American Jurisprudence, second edition, 1965, volume 18, page 561, states the law applicable as follows:

* * * The corporate entity is generally disregarded where it is used as a cloak or cover * * * or to work an injustice * * *. [Citing cases.] The corporate entity may be disregarded when failure to do so would enable the corporate device to be used to circumvent a statute. *Alabama Power Co.* v. *McNinch*, 68 App. D.C. 132, 94 F. 2d 601.

The above volume, page 562, further states:

* * * Where the corporate fiction is merely an alter ego or business conduit of an individual, it may be disregarded in the interest of securing a just determination of an action. * * * [Citing cases.]

On facts similar in part to the facts in this case, the court in *Dorf International, Inc., et al.* v. *United States, supra*, stated:

* * * The aforementioned conditions of the contract are repugnant to a buyer-seller relationship, but at the same time are compatible with a principal-agent relationship between the contracting parties.

Neither is the court convinced that the vesting of indicia of ownership of the merchandise in the plaintiff-importer militates against plaintiff's status as an agent. The court views this arrangement as a measure employed by Universal to secure payment for merchandise which it ships out of the country of exportation into the United States.

On the record herein plaintiffs have failed to establish their claim that $14,900 and $14,850 represent the export value of the boats imported respectively in R66/16587 and R66/16588. Hence, the appraised export values of $20,015 and $17,992 have not been overcome and should remain in full force and effect as presumptively correct (28 U.S.C., section 2633). See *United States* v. *Collin & Gissel (Ludwig*

*Baer*), 29 CCPA 96, 103, C.A.D. 176; *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495, citing cases; *Kenneth Kittle-son* v. *United States*, 40 CCPA 85, C.A.D. 502; *Kobe Import Co.* v. *United States*, 42 CCPA 104, C.A.D. 593.

Accordingly, on the record herein, the court makes the following findings of fact:

1. That the imported merchandise consists of one 36 foot power cruiser complete with engines in R66/16587, which was exported by American Marine, Ltd., Hong Kong, on or about August 29 or 30, 1964, and entered at Seattle, Washington, on September 28, 1964. Entry was made at the invoice price of $14,900 f.o.b. with freight and insurance payable at destination. This boat was appraised at $20,015, net packed, on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165.

2. That in R66/16588 the imported merchandise consists of one 35 foot Magellan class motorsailer including lifelines, pulpit, mainsail, and No. 2 jib. This boat was exported by American Marine, Ltd., Hong Kong, on or about July 27, 1965, and entered at Seattle, Washington, on August 13, 1965. Entry was made at the invoice price of $14,850 f.o.b. with freight and insurance payable at destination. This boat was appraised at $17,992, net packed, on the basis of export value as defined, *supra*.

3. Robert Newton & Sons, Inc., of Costa Mesa, California, is alleged to be the purchaser of these boats which were shipped direct to Salmon Bay Marina, Seattle, Washington, by American Marine, Ltd., Hong Kong.

4. In R66/16587 entry was made by the customs broker Robert E. Landweer & Co., Inc., of Seattle, Washington, for the account of Robert Newton & Sons, Inc., and in R66/16588 entry was made by Salmon Bay Marina, ℅ Robert E. Landweer & Co., Inc.

5. The imported merchandise does not appear on the final list, 93 Treas. Dec. 14, T.D. 54521, promulgated pursuant to the Customs Simplification Act of 1956, *supra*.

6. Counsel agree that export value as defined, *supra*, is the proper basis for appraisement.

7. The business relationship between American Marine, Ltd., through its president, Robert Newton, with Robert Newton & Sons, Inc., was not in the ordinary course of trade.

I conclude as matters of law:

1. On the record, the business relationship between American Marine, Ltd., Robert Newton, and Robert Newton & Sons, Inc., is not consistent with that of a buyer and seller but is compatible with a

relationship of seller and its selling agent working on a selling commission basis, and that selling commissions are dutiable items.

2. Robert Newton & Sons, Inc., through Robert Newton, was the *alter ego* business conduit for American Marine, Ltd., of which Robert Newton was a major stockholder, its president, and managing director.

3. The Robert Newton & Sons, Inc., corporate entity may be disregarded as a device to circumvent a customs statute in the proper ascertainment of an export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, *supra*.

4. The claimed export value by the plaintiff is not established by the record and the appraised values must be affirmed as presumptively correct. (28 U.S.C., section 2633.)

Judgment will be entered accordingly.